### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF FLORIDA
### PANAMA CITY DIVISION

UNITED STATES OF AMERICA

v.

**SEALED**
**INDICTMENT**

AMANDA GIOVANNI
  a/k/a "Agharid Karim Daqud Bahoura"
CLARK ONSTAD
KENNETH COOK

5:17cr 32 - RH

_____ /

## THE GRAND JURY CHARGES:

## COUNT ONE

### A. INTRODUCTION

At all times material to this Indictment:

1.    Business Innovation and Development Solutions, Inc. ("BIDS") was incorporated in the State of Maryland on March 6, 2008, and purported to be incorporated for management and marketing consultation. The corporate charter for BIDS was forfeited and dissolved by the State of Maryland on October 1, 2015.

2.    **AMANDA GIOVANNI** was the president and chief operating officer of BIDS. **CLARK ONSTAD** represented himself to be the chief financial officer of BIDS. BIDS maintained accounts at TD Bank, Bank of America, and Capitol One. **GIOVANNI** had sole signatory authority for each of these accounts.

3. Solutions 4 VIP LLC ("Solutions") was incorporated in the State of Delaware on August 4, 2007, by **CLARK ONSTAD**. Solutions maintained an account at J.P. Morgan Bank that **ONSTAD** controlled.

4. All American Training Center, also known as American Glass Company ("All American"), was incorporated in the State of Virginia on August 4, 2007, and claimed to provide training to law enforcement officers and security personnel. **KENNETH COOK** was the president of All American. **COOK** maintained bank accounts for All American and himself at Suntrust Bank, Wells Fargo, and Bank of America.

5. The United States Department of State ("DOS") was an agency of the United States of America, and was responsible for regulating persons engaged in the business of brokering activities relating to the manufacture, export, import, or transfer of any United States or foreign defense articles or defense services, in accordance with federal law (the Arms Export Control Act ("AECA") and the International Traffic in Arms Regulations ("ITAR").

6. Federal law required the registration of any person intending to engage in the brokering activities described above in paragraph five and prohibited any person from engaging in the business of such brokering activities without first obtaining a license issued in accordance with federal law. The Directorate of Defense Trade Controls ("DDTC") of the DOS was the approving entity for

2

issuance of the brokering license, and had an office to ensure compliance with brokering registration and licensing. Registered brokers were also required to comply with separate registration requirements under the ITAR. Registration did not confer any export rights or privileges, but was a precondition for the issuance of any license or other approval for export. Any person or company who intended to export or temporarily import a defense article, defense service, or technical data was required to obtain prior approval from DDTC. An appropriate license form was required to be submitted for the purpose of seeking approval, and in order for a license to be considered, a person or company must first be registered with DDTC.

7.   **AMANDA GIOVANNI, CLARK ONSTAD, KENNETH COOK,** and BIDS did not apply for, nor receive approval for, any export license for the manufacture, export, import, or transfer of any United States or foreign defense articles or defense services.

8.   The Defense Contract Management Agency ("DCMA") was an agency of the United States responsible for performing contract administration services for the United States Department of Defense and other authorized federal agencies, and handled foreign military sales contracts.

## B. THE CHARGE

Between on or about October 1, 2013, and on or about March 31, 2016, in the Northern District of Florida and elsewhere, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

did knowingly and willfully combine, conspire, confederate, and agree together and with other persons to devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, and to cause wire communications to be transmitted in interstate and foreign commerce for the purpose of executing such scheme, in violation of Title 18, United States Code, Section 1343.

## C. MANNER AND MEANS

The manner and means by which this conspiracy was committed included the following:

1.     **AMANDA GIOVANNI** used BIDS as a means to extort and fraudulently obtain money from individuals and entities.

2.     **AMANDA GIOVANNI** falsely claimed that she represented the United States government and was licensed by the DOS to broker the sale of military weapons and supplies to the Kurdistan Regional Government (KRG) in

Iraq and to other countries, and sought assistance and money from M.B. in connection with a contract **GIOVANNI** claimed to be brokering between the United States and the KRG.

3. In October 2013, **AMANDA GIOVANNI** obtained approximately $30,000 in cash from M.B. based upon **GIOVANNI**'s false representations that the money was needed to pay fees associated with a contract **GIOVANNI** claimed to be brokering between the United States and the KRG.

4. In November 2013, **AMANDA GIOVANNI** obtained $70,000 in cash from M.B. based upon **GIOVANNI**'s false representations that she needed to register his company, Golden Eye, with the DDTC and DCMA in the United States as part of the KRG securing a contract with the United States for the purchase of military weapons and items.

5. In December 2013, **AMANDA GIOVANNI** took M.B. to the United States Consulate in Erbil, Iraq, to have a document notarized that **GIOVANNI** falsely claimed to be a document authorizing the terms of the military arms contract with the KRG.

6. In February 2015, **CLARK ONSTAD** contacted C.M. inquiring about arranging a weapons deal with Kurdistan. C.M. explained the ITAR regulations and restrictions regarding the sale of arms to Kurdistan to **ONSTAD**, and told **ONSTAD** the proposed sale of arms to Kurdistan would be illegal.

7.     In May 2015, **AMANDA GIOVANNI** contacted M.B. in Erbil, Iraq,

and stated that they could continue their arms business deal that had stalled and

falsely claimed that the United States Consulate in 2013 had stamped the assurance

of the arms contract document with "indefinite approval." **GIOVANNI** solicited

M.B. to identify specific weapons that the Kurds wanted.  She also provided a

letter to M.B., addressed to the President of the Kurdistan Regional Government,

inviting the President to finalize the first phase of a joint venture partnership,

begun in 2013, relating to arms and military items between the United States and

Kurdistan.  In the letter, **GIOVANNI** falsely identified Golden Eye as the

company that already was established to handle the transaction.

8.     In July 2015, **ONSTAD** introduced C.M. to **AMANDA GIOVANNI**,

and **GIOVANNI** met with C.M. and discussed the pricing of certain military

equipment.  **GIOVANNI** falsely told C.M. that BIDS was registered with the DOS

and permitted to broker arms deals overseas, and falsely stated that she worked for

the DDTC as an ITAR compliance reciprocity agent and was a certified

independent tester at the DCMA.

9.     In August 2015, **AMANDA GIOVANNI** falsely told C.M. that he

was being investigated by the Department of Justice ("DOJ") for brokering illegal

sales of weapons to a foreign country.  **GIOVANNI** falsely told C.M. that

**KENNETH COOK**, an investigator and associate of hers, had obtained

6

information that C.M.'s wife was engaged in an extramarital affair. **GIOVANNI** also falsely claimed that C.M.'s wife had retained an attorney to file divorce proceedings against C.M., and that C.M. needed to retain a lawyer. **GIOVANNI** said that she and **ONSTAD** would assist in retaining a lawyer for C.M.

10.    In August 2015, **AMANDA GIOVANNI** caused L.V. to incorporate Golden Eye and establish a corporate address, telephone number, and an e-mail account for Golden Eye. This information was provided by **GIOVANNI** to M.B. in Erbil, Iraq.

11.    In August 2015, **AMANDA GIOVANNI** fraudulently obtained $75,000 from L.V. based upon false statements that: she had an approved license from DDTC to ship items outside of the United States; she would add L.V.'s contract to sell ambulances to Egypt to her DDTC export license for the sale of military items to Iraq, Algeria, and Egypt; and DDTC required the payment of $75,000 as a bid bond deposit for the contract.

12.    **AMANDA GIOVANNI** caused L.V. to wire $75,000 into a "DDTC Escrow Account" that **GIOVANNI** falsely stated was a Government DDTC escrow account, but in fact was a bank account opened by **GIOVANNI** as sole signatory, which had nothing to do with the DDTC.

13.    **AMANDA GIOVANNI** transferred by wire $10,000 of the $75,000 described above to the Solutions account of **CLARK ONSTAD**. Another portion

of the $75,000 was used for airfare for **GIOVANNI** and C.M. to travel to Colorado to meet with **ONSTAD** (as described in paragraph sixteen below), and some of the monies were wired by **ONSTAD** to an individual in the United Arab Emirates at the request of **GIOVANNI** and a co-conspirator.

14.     **AMANDA GIOVANNI, CLARK ONSTAD,** and **KENNETH COOK** made repeated false statements to C.M. that C.M. needed legal representation for the pending divorce, the custody battle for his children, and the DOJ investigation of him. They falsely represented that only a retained attorney could receive the evidence that **COOK** and **ONSTAD** had obtained concerning C.M.'s wife's purported infidelity. **COOK** and **ONSTAD** claimed that if C.M. saw this evidence, the chain of custody would be broken and the evidence could not be used in court to defend C.M.

15.     In September 2015, **AMANDA GIOVANNI** met with C.M. and his parents and falsely claimed that C.M was in serious trouble, and requested money from C.M.'s parents.

16.     In September 2015, **AMANDA GIOVANNI** and **CLARK ONSTAD** induced C.M. to travel to Colorado to meet with them concerning the marital and legal problems he was purportedly facing. **GIOVANNI** and **ONSTAD** prepared, and caused C.M to sign, a retention agreement that provided for a $250,000 payment to **ONSTAD, GIOVANNI,** and **COOK** for the work that they claimed to

have done in gathering information about the problems that C.M. faced, and a

$1,000,000 non-refundable fee for two law firms to represent C.M for the alleged

divorce, the custody issue, and the alleged DOJ investigation of C.M.

17.   In September 2015, **AMANDA GIOVANNI** and **KENNETH**

**COOK** met with C.M. and took him to a residence in Virginia owned by **COOK**.

There, **GIOVANNI** and **COOK** claimed to have a video tape that **COOK** had

obtained proving the infidelity of C.M.'s wife; but they refused to provide the

evidence to C.M., claiming it could only be provided to an attorney.

18.   In September 2015, **CLARK ONSTAD** called and e-mailed C.M.'s

father, demanded the payment of money for representation of C.M., and sought to

meet with C.M.'s parents as soon as possible.

19.   In September 2015, **AMANDA GIOVANNI, CLARK ONSTAD,**

and **KENNETH COOK** met with C.M.'s parents at a restaurant in Virginia.

During the meeting, **ONSTAD** falsely told C.M.'s parents that C.M was under

investigation by DOJ and faced a mandatory five years in prison for his conduct in

an illegal export transaction. **ONSTAD** further claimed that C.M. was facing a

significant divorce and custody battle. **ONSTAD** falsely told C.M.'s parents that if

they didn't send $1,250,000 to **ONSTAD**, their son would go to prison and his

children would end up in foster care. **ONSTAD** urged C.M.'s parents to listen to

**COOK**, who falsely represented that he and **GIOVANNI** had installed

9

surveillance equipment inside C.M.'s wife's office and had obtained evidence of her infidelity.

20.    In September 2015, **KENNETH COOK** and **AMANDA GIOVANNI** made arrangements with a physician, a friend of **COOK**, to examine the children of C.M. based upon the false representations of **GIOVANNI** and **COOK**.

21.    In September 2015, **AMANDA GIOVANNI, CLARK ONSTAD,** and **KENNETH COOK** induced the parents of C.M. to wire $500,000 to a Solutions Colorado bank account, which was controlled by **ONSTAD**.

22.    After the first wire transaction, **CLARK ONSTAD** made repeated calls to C.M.'s father, demanding that the remainder of money, $750,000, be wired to **ONSTAD**.

23.    Seven days after the first wire of $500,000, **AMANDA GIOVANNI, CLARK ONSTAD,** and **KENNETH COOK** induced the parents of C.M. to wire $750,000 to a Solutions bank account, which was controlled by **ONSTAD**.

24.    In September 2015, **AMANDA GIOVANNI** and **CLARK ONSTAD** directed C.M. to turn over to them all personal home documents, computers, cell phones, and two firearms, which the co-conspirators falsely stated were required to be reviewed by the co-conspirators and for the protection of C.M.

10

25.    In September 2015, after the receipt of the $500,000 wire transfer to the Solutions account, **CLARK ONSTAD** wire transferred $469,970 to a BIDS bank account of **AMANDA GIOVANNI**.

26.    From the $469,970 she received, **AMANDA GIOVANNI**:

     a.    immediately purchased a $100,000 cashier's check payable to All-American (owned by **KENNETH COOK**);

     b.    provided the $100,000 cashier's check to **KENNETH COOK**;

     c.    wired $36,451 to a co-conspirator's bank account in Panama City, Florida, and directed the co-conspirator to wire transfer some of the money to a bank account in China that was controlled by another co-conspirator;

     d.    provided $30,000 to a boyfriend;

     e.    withdrew $29,000 in cash from her BIDS account; and

     f.    transferred $100,000 to one of her personal bank accounts.

27.    In September 2015, after the receipt of the $750,000 wire transfer from C.M.'s parents in Colorado, **CLARK ONSTAD** wire transferred $749,970 to a BIDS bank account of **AMANDA GIOVANNI**.

28.    From the $749,970 she received, **AMANDA GIOVANNI**:

     a.    transferred $500,000 and $50,000 to other BIDS bank accounts;

     b.    wire transferred $60,000 to **CLARK ONSTAD**;

    c.    issued a $20,000 check to All American (owned by

          **KENNETH COOK**);

    d.    made wire transfers totaling $47,500 to a co-conspirator's bank

          account in Panama City, Florida;

    e.    withdrew approximately $51,000 in cash; and

    f.    paid approximately $161,000 to individuals **GIOVANNI** was

          using to assist her in the scheme to defraud the Kurds.

29.    In September 2015, **AMANDA GIOVANNI** and **CLARK ONSTAD**

met with C.M. and attempted to have C.M. sign a professional services agreement

retaining BIDS and its alleged "Forensics, E-Discovery and Digital Investigations

Department" to assist C.M. with upcoming litigation and requiring C.M. to pay

BIDS a pre-paid retainer fee of $3,000,000 within several days.

30.    In October 2015, **AMANDA GIOVANNI** and **CLARK ONSTAD**

made calls and sent e-mails to C.M and C.M.'s father threatening to make public

the information that they had concerning C.M., terminating their relationship with

C.M., and refusing to return any of the money or any of the items provided by

C.M. to **GIOVANNI** and **ONSTAD**.  **GIOVANNI** also threatened to travel to

C.M.'s residence and take the children of C.M.

31.    In October 2015, **CLARK ONSTAD** advised **AMANDA**

**GIOVANNI** that C.M.'s father had stated that he was going to call the FBI and

advise them that he had been "flimflammed" out of $1.25 million.  The co-conspirators agreed to use a code for discussing C.M. in the future and not to discuss anything about him in their e-mails and texts.

32.    In October 2015, **AMANDA GIOVANNI** fraudulently induced M.B. to pay for the airfare of **GIOVANNI** and two other individuals to travel from the United States to Erbil, Iraq, for the purpose of proceeding with the proposed contract of providing arms and military items to the Kurds.  **GIOVANNI** withdrew $50,000 in cash from a BIDS account, which was proceeds of the C.M. extortion, and transported the money to Erbil, Iraq.

33.    Between October 2015 and January 2016, **KENNETH COOK** agreed to handle matters for **AMANDA GIOVANNI** while she was out of the country and received e-mails from individuals, relayed messages to and from **GIOVANNI**, and did other specific acts to assist in the scheme to defraud.

34.    In October and November 2015, **AMANDA GIOVANNI** and other individuals, whom she introduced as part of the BIDS team to finalize the arms contract with the Kurds, met M.B. outside the United States to discuss specifics of the contract.  **GIOVANNI** falsely told M.B. that they were working on a covert project to get weapons into Kurdistan at the direction of the United States. **GIOVANNI** repeatedly told M.B. that she would waive her 25% broker's commission but demanded that 80% of the sale price had to be paid up front,

13

before the transaction was completed, and the money had to be transferred into a "DDTC Escrow Account."

35.   In November 2015, **AMANDA GIOVANNI** asked **KENNETH COOK** to configure several laptop computers and provide them to a BIDS employee at an airport for delivery to **GIOVANNI** in a foreign country.

36.   In December 2015, **AMANDA GIOVANNI** directed an employee to withdraw $50,000 in cash, part of the proceeds of the C.M. extortion, from a BIDS account and provide it to another employee who was directed to carry the money out of the country and give it to **GIOVANNI** in a foreign country. **KENNETH COOK** met the employee at an airport and provided guidance concerning secreting the money on the employee's person and not reporting the currency when leaving the country.

37.   Between August 2015, and March 2016, **AMANDA GIOVANNI** and a co-conspirator solicited an individual in Pensacola, Florida, to enter into an agreement to operate a training center for helicopter pilots and flight engineers in Kirkut, Iraq.  In e-mail and telephone communications to the individual, **GIOVANNI** falsely represented that she was a United States Government "ITAR Representative" and a "Broker/ITAR Reciprocity Agent of the United States for the DDTC."

14

38.   Between 2013 and 2016, **AMANDA GIOVANNI** falsely represented herself to be affiliated with DCMA as a DCMA GQA (Government Quality Assurance) Representative and Independent Tester.

39.   The conspirators performed acts and made statements to hide and conceal, and cause to be hidden and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH FIFTEEN

### A.  INTRODUCTION

The allegations of Count One are hereby realleged and incorporated by reference as if fully set forth herein.

### B.  THE CHARGE

Between on or about October 1, 2013, and on or about March 31, 2016, in the Northern District of Florida and elsewhere, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

did knowingly and willfully devise, and intend to devise, a scheme to defraud and for obtaining money and property by means of material false and fraudulent pretenses, representations, and promises, and for the purpose of

15

executing such scheme, did cause wire communications to be transmitted in interstate and foreign commerce.

## C.  SCHEME TO DEFRAUD

It was part of the scheme to defraud that:

The allegations of Count One, Section C, Paragraphs 1-39, are hereby realleged and incorporated by reference as if fully set forth herein.

## D.  WIRE COMMUNICATIONS

On or about the following dates, for the purpose of executing the scheme to defraud, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

knowingly did cause wire communications to be transmitted in interstate and foreign commerce as set forth below:

| COUNT | DATE | COMMUNICATION | TO/FROM |
|---|---|---|---|
| TWO | September 21, 2015 | $36,451.40 incoming wire | Panama City Beach, Florida/Alexandria, Virginia |
| THREE | September 22, 2015 | $8,800 outgoing wire | United Arab Emirates/Panama City Beach, Florida |
| FOUR | September 22, 2015 | $8,800 outgoing wire | United Arab Emirates/Panama City Beach, Florida |

16

| FIVE | September 23, 2015 | $7,000 outgoing wire | United Arab Emirates/Panama City Beach, Florida |
| SIX | September 23, 2015 | $6,100 outgoing wire | United Arab Emirates/Panama City Beach, Florida |
| SEVEN | September 29, 2015 | $20,000 incoming wire | Panama City Beach, Florida/Alexandria, Virginia |
| EIGHT | October 2, 2015 | $7,500 incoming wire | Panama City Beach, Florida/Alexandria, Virginia |
| NINE | October 8, 2015 | $7,500 outgoing wire | China/Panama City Beach, Florida |
| TEN | November 16, 2015 | $10,000 incoming wire | Panama City Beach, Florida/Alexandria, Virginia |
| ELEVEN | November 18, 2015 | $10,000 incoming wire | Panama City Beach, Florida/Alexandria, Virginia |
| TWELVE | November 18, 2015 | $8,900 outgoing wire | United Arab Emirates/Panama City Beach, Florida |
| THIRTEEN | February 10, 2016 | Telephone Conference Call | Pensacola, Florida/United Arab Emirates |
| FOURTEEN | February 15, 2016 | E-mail with Letter of Intent attachment | United Arab Emirates/Pensacola, Florida |
| FIFTEEN | February 28, 2016 | E-mail | United Arab Emirates/Pensacola, Florida |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIXTEEN

On or about September 21, 2015, in the Northern District of Florida and elsewhere, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

did knowingly use a facility of interstate commerce, namely, interstate wires, with intent to distribute the proceeds of an unlawful activity, that is, extortion, in violation of the laws of the State of Virginia as prescribed in VA Code Ann. § 18.2-59, and did thereafter perform and attempt to perform an act to distribute the proceeds of such unlawful activity.

In violation of Title 18, United States Code, Sections 1952(a)(1), 1952(b)(2), and 2.

## COUNT SEVENTEEN

On or about September 29, 2015, in the Northern District of Florida and elsewhere, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

18

did knowingly use a facility of interstate commerce, namely, interstate wires, with intent to distribute the proceeds of an unlawful activity, that is, extortion, in violation of the laws of the State of Virginia as prescribed in VA Code Ann. § 18.2-59, and did thereafter perform and attempt to perform an act to distribute the proceeds of such unlawful activity.

In violation of Title 18, United States Code, Sections 1952(a)(1), 1952(b)(2), and 2.

## COUNT EIGHTEEN

On or about October 2, 2015, in the Northern District of Florida and elsewhere, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

did knowingly use a facility of interstate commerce, namely, interstate wires, with intent to distribute the proceeds of an unlawful activity, that is, extortion, in violation of the laws of the State of Virginia as prescribed in VA Code Ann. § 18.2-59, and did thereafter perform and attempt to perform an act to distribute the proceeds of such unlawful activity.

In violation of Title 18, United States Code, Sections 1952(a)(1), 1952(b)(2), and 2.

19

## COUNT NINETEEN

On or about November 16, 2015, in the Northern District of Florida and elsewhere, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

did knowingly use a facility of interstate commerce, namely, interstate wires, with intent to distribute the proceeds of an unlawful activity, that is, extortion, in violation of the laws of the State of Virginia as prescribed in VA Code Ann. § 18.2-59, and did thereafter perform and attempt to perform an act to distribute the proceeds of such unlawful activity.

In violation of Title 18, United States Code, Sections 1952(a)(1), 1952(b)(2), and 2.

## COUNT TWENTY

On or about November 18, 2015, in the Northern District of Florida and elsewhere, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

did knowingly use a facility of interstate commerce, namely, interstate wires, with

intent to distribute the proceeds of an unlawful activity, that is, extortion, in

violation of the laws of the State of Virginia as prescribed in VA Code Ann.

§ 18.2-59, and did thereafter perform and attempt to perform an act to distribute

the proceeds of such unlawful activity.

In violation of Title 18, United States Code, Sections 1952(a)(1), 1952(b)(2),

and 2.

## COUNT TWENTY-ONE

Between on or about December 23, 2015, and on or about March 15, 2016,

in the Northern District of Florida, the defendant,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**

knowingly, willfully, and with the intent to defraud, did falsely assume and pretend

to be an officer and employee acting under the authority of the United States and a

department and agency thereof, namely, the Department of State and the Director

of the Defense Trade Controls, and did act as such.

In violation of Title 18, United States Code, Section 912.

## COUNT TWENTY-TWO

On or about February 8, 2017, in the Northern District of Florida, in a matter

within the jurisdiction of the executive branch of the Government of the United

21

States, that is, the Department of Justice and Department of Treasury, the defendant,

**KENNETH COOK,**

did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, to wit, the defendant falsely stated that:

(1) he didn't know that Amanda Giovanni had received any money from C.M.'s father;

(2) the $100,000 that he received was for work performed in 2012 concerning a training program;

(3) the invoices for $100,000 that he had received from Giovanni were legitimate;

(4) he never provided security services to Giovanni and his only dealings with her involved a training program; and

(5) he never went to the airport when a Giovanni employee, E.K., was travelling overseas to meet with Giovanni,

whereas, in truth and in fact, and as the defendant well knew, Giovanni had received money from C.M.'s father; the $100,000 that **COOK** received from Giovanni was not for work performed in 2012 concerning a training program; the invoices for $100,000 that he provided to an FBI agent were not for a training program provided to Giovanni in 2012; **COOK**'s dealings with Giovanni involved

22

more than a training program; and he did travel to an airport when a Giovanni employee, E.K., was traveling overseas to meet with Giovanni.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT TWENTY-THREE

Between on or about August 1, 2015, and on or about December 1, 2015, in the Northern District of Florida and elsewhere, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

did knowingly combine, conspire, confederate, and agree together and with other persons to commit an offense, namely:

1. to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, that is, the interstate transfer of monetary instruments in the form of United States currency within a financial institution, involving funds that were proceeds of a specified unlawful activity, that is, conspiracy to commit wire fraud, wire fraud, and the use of a facility in interstate and foreign commerce to distribute the proceeds of extortion, in violation of Title 18, United States Code, Sections 1343, 1349, and 1952(a), and that the defendants knew to be the proceeds of some form of unlawful activity, with the

intent to promote the carrying on of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

2.     to knowingly transport, transmit, and transfer a monetary instrument, that is, currency of the United States, from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, that is, conspiracy to commit wire fraud, wire fraud, and the use of a facility in interstate and foreign commerce to distribute the proceeds of extortion, in violation of Title 18, United States Code, Sections 1343, 1349, and 1952(a), in violation of Title 18, United States Code, Section 1956(a)(2)(A).

All in violation of Title 18, United States Code, Section 1956(h).

### CRIMINAL FORFEITURE

The allegations contained in Counts One through Twenty and Twenty-Three of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture. From their engagement in the violations alleged in Counts One through Twenty and Twenty-Three of this Indictment, the defendants,

**AMANDA GIOVANNI,**
**a/k/a "Agharid Karim Daqud Bahoura,"**
**CLARK ONSTAD,**
**and**
**KENNETH COOK,**

24

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of the defendants' right, title, and interest in any property, real and personal, constituting, and derived from, proceeds traceable to such offenses. And pursuant to Title 18, United States Code, Section 982(a)(1), upon a conviction of an offense in violation of Title 18, United States Code, Section 1956 (Count Twenty-Three), the defendants shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property.

If any of the property described above as being subject to forfeiture, as a result of acts or omissions of the defendants:

i.      cannot be located upon the exercise of due diligence;

ii.      has been transferred, sold to, or deposited with a third party;

iii.      has been placed beyond the jurisdiction of this Court;

iv.      has been substantially diminished in value; or

v.      has been commingled with other property that cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1),

and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other

property of said defendants up to the value of the forfeitable property.

A TRUE BILL:

**REDACTED**

FOREPERSON

_____11-14-17_____
DATE

_____
CHRISTOPHER P. CANOVA
United States Attorney

_____
STEPHEN M. KUNZ
Assistant United States Attorney

26