UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY, FLORIDA


*UNITED STATES OF AMERICA,*          )
                                     )
                   *Plaintiff,*      ) *Case No:  5:17-cr-32/RH*
                                     )
*vs.*                                ) *Panama City, Florida*
                                     ) *May 16, 2018*
*AMANDA GIOVANNI, CLARK*             )
*ONSTAD, AND KENNETH COOK,*          )
                                     )
                   *Defendants.*     )
_____  )


### TESTIMONY OF LAWRENCE BORGHINI


TRANSCRIPT OF ** EXCERPT ** OF MOTION HEARING
BEFORE THE HONORABLE ROBERT L. HINKLE,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

  For the Plaintiff,       Christoper P. Canova
  United States of         United States Attorney
  America:                 By:  STEPHEN M. KUNZ
                                Assistant U.S. Attorney
                                *stephen.kunz@usdoj.gov*
                           111 North Adams Street
                           Suite 400
                           Tallahassee, Florida   32301


  For the Defendant,       Todd Foster Law Group
  Amanda Giovanni:         By:  TODD A. FOSTER
                                MATTHIEU GODDENYE
                                NATALIA B. SILVER
                                Attorneys at Law
                                *tfoster@tfosterlaw.com*
                                *mgoddeyne@tfosterlaw.com*
                                *nsilver@tfosterlaw.com*
                           1881 West Kennedy Boulevard
                           Tampa, Florida 33606



```
APPEARANCES:  Cont'd

For the Defendant,       Downing Law Offices
Clark Onstad:            By:  JEAN MARIE DOWNING
                              Attorney at Law
                                 jdowning@pcbeachlaw.com
                         2612-B West 15th Street
                         Panama City, Florida   32401


For the Defendant,       Cassidy Law Firm
Kenneth Cook:            By:  THOMAS J. CASSIDY, III
                              Attorney at Law
                                 cassidylawfirm@comcast.net
                         233 East Beach Drive
                         Panama City, Florida   32401
```

1                    *   *   *   *   *   *   *   *

2          MR. KUNZ:  Judge, I think you told counsel that he

3     could proceed with a *Franks* hearing and call Agent Borghini.

4          THE COURT:  Well, at least he's going to talk about

5     the particularity issue on that search, so you can put him on

6     and find out what he did and how he did it.

7          MR. KUNZ:  Okay.

8          THE COURT:  Mr. Borghini?

9          DEPUTY CLERK:  Please raise your right hand.

10     **LAWRENCE BORGHINI, GOVERNMENT WITNESS, DULY SWORN**

11          DEPUTY CLERK:  Be seated.

12          Please, state your full name and spell your last

13     name for the record.

14          THE WITNESS:  Lawrence Borghini, B-o-r-g-h-i-n-i.

15                         DIRECT EXAMINATION

16     BY MR. KUNZ:

17     Q.  Good morning, Agent.

18     A.  Good morning.

19     Q.  Sir, by whom are you employed?

20     A.  Federal Bureau of Investigation.

21     Q.  And how long have you been so employed, sir?

22     A.  Just over 22 years.

23     Q.  Okay.  And are you one of the case agents involved with

24     respect to the prosecution of Defendant Amanda Giovanni?

25     A.  I am.

1  Q.  Okay.  And are you aware of a search warrant that was

2  executed in the Eastern District of Virginia with respect to

3  an address that Ms. Giovanni was residing in in January of

4  2017 -- January 11, 2017?

5  A.  Yes.

6  Q.  Okay.  And that particular search warrant, did you have

7  any role with respect to obtaining that search warrant?

8  A.  Yes.

9  Q.  Can you explain to the court what your role was with

10  respect to that?

11  A.  The search warrant was to be executed in another

12  district; however, I was the case agent so I had knowledge of

13  the case and the facts of the case.

14      I initially prepared a draft of a search warrant, and I

15  sent it up to the Eastern District of Virginia.  That draft

16  was then conveyed to the U.S. Attorney's Office up there, and

17  our local -- a local field office also got involved in

18  drafting that search warrant as well.

19  Q.  Okay.  And the affiant was an FBI agent from the Eastern

20  District; is that correct?

21  A.  Nathan Frank; that's correct.

22  Q.  And did you meet with him and discuss with him the facts

23  that you were aware of such that he was able to put this in

24  the final form?

25  A.  Yes.  He worked with an AUSA up there and got it into the

1  final form; that's correct.

2  Q.  And did you -- were you given the final draft of the

3  affidavit and did you indicate to the Assistant U.S. Attorney

4  and the agent up there that you thought it was correct?

5  A.  Yes.

6  Q.  Now, with respect to the search warrant, the search

7  warrant itself, was that prepared by the U.S. Attorney's

8  Office up there in the Eastern District?

9  A.  It was.

10  Q.  And the attachments, likewise, was that reviewed by you

11  and with the U.S. Attorney up there -- Assistant U.S.

12  Attorney prepared that as well?

13  A.  Yes, I saw all of the documents.

14  Q.  And that was presented to the Magistrate Judge, right, of

15  the Eastern District of Virginia?

16  A.  It was.

17  Q.  Okay.  And he signed the warrant; is that right?

18  A.  He did.

19  Q.  And let's talk about the items being searched.

20      Now, you had -- prior to this search warrant, you had

21  done a pretty extensive investigation; is that correct?

22  A.  That's correct.

23  Q.  And you specifically identified or Agent Frank identified

24  in his affidavit, but actually you prepared the main draft of

25  that affidavit; is that correct?

1    A.   That is correct.

2    Q.   Okay.  And the specific statutory violations that you

3    were looking for any evidence or fruits or instrumentality

4    related to were listed in Attachment B of the search

5    warrant -- attached to the search warrant and also attached

6    to the affidavit; is that correct?

7    A.   Yes, they were in both places.

8    Q.   Okay.  And, specifically, there was a list -- the first

9    paragraph of Attachment B, that describes the various

10   criminal offenses that you were looking for; is that correct?

11   A.   Yes.

12   Q.   Okay.  And those crimes, were they outlined in the

13   affidavit of Agent Frank?

14   A.   Yes.

15   Q.   In the affidavit.  So your understanding of the requested

16   Categories 1 through 9 of Attachment B, those were based on

17   and related to the violations that had been demonstrated --

18   violations of law that you believe had been committed, were

19   demonstrated in the affidavit; is that correct?

20        MR. FOSTER:  Sir, I object.  I'm not objecting to a

21   lot of the leading because it's preliminary, but this is more

22   than that.

23        THE COURT:  Don't lead.

24        MR. KUNZ:  Yes, sir.

25   BY MR. KUNZ:

1  Q.  Can you explain to the court the basis for the categories

2  in Attachment B and how that related to what you were hoping

3  to obtain in evidence from that address?

4  A.  The affidavit laid out the facts as we knew them, the

5  violations that we believed had been committed, and the time

6  frames and the individuals involved in those acts.

7  Attachment B sought items that the government believed would

8  be at that address that supported or evidence of those

9  crimes.

10  Q.  Okay.  And each of the categories in Attachment B, had

11  you reviewed that, those categories, and felt that's what you

12  were looking for in the search warrant?

13  A.  Yes.  Those were all typical stuff you would look at in

14  these types of violations, in these types of cases:

15  documents, records, business records, computer devices,

16  electronic devices.

17  Q.  And did your -- the affidavit in support of the search

18  warrant, did that describe in your view a pretty extensive or

19  pervasive fraud that was being committed?

20        MR. FOSTER:  Objection to the conclusory nature of

21  the question, the legal significance.

22        THE COURT:  It won't matter.  Overruled.

23        THE WITNESS:  It established there was probable

24  cause, yes.

25  BY MR. KUNZ:

1   Q.  Okay.  Now, prior to the -- once the Magistrate Judge had

2   signed the warrant authorizing the FBI to search the location

3   there on Alicia Court in Virginia, did you have a meeting

4   with the agents up there and explain to them the nature of

5   the case and require all agents who were participating in the

6   search to review the search warrant as well as the two

7   attachments:  Attachment A and Attachment B?

8   A.  Yes.  There was a briefing, and everyone who were to

9   participate in the search was at that briefing.

10  Q.  Okay.

11         MR. FOSTER:  Excuse me.  It wasn't responsive.  He

12  asked him if he had everybody review the search warrant and

13  the affidavit, and the gentleman said everybody was at the

14  briefing.  So I didn't hear the answer.

15         THE COURT:  Tell us again.

16         THE WITNESS:  Yes, sir.  I will go into detail.

17         The day prior there was a briefing.  All of the

18  agents who were to participate in the search that day were at

19  that briefing.  At that briefing I gave a case overview of the

20  facts as they were laid out in the affidavit and some more

21  that I knew as a result of the investigation.

22         At that point, after the briefing, there was an

23  operational briefing, how we were going to conduct everything.

24  All of the members in attendance at that briefing were

25  required to read the search warrants and read the attachments,

1    and then there was a piece of paper in which they all signed

2    stating they had done that.

3    BY MR. KUNZ:

4    Q.  You said search warrants.  Did you also mean the

5    affidavit in support of the search warrant?

6    A.  Correct.  The search warrant and all the attachments and

7    the affidavit as well; that's correct.

8    Q.  So when the eight agents executed the search warrant on

9    January 11th in the Eastern District, although the defense in

10    their motion indicated no one knew anything about it, each

11    agent --

12           MR. FOSTER:  I object to that characterization.

13           THE COURT:  Sustained.  Just ask the question.

14    BY MR. KUNZ:

15    Q.  So is it your testimony that each agent participating in

16    the search was aware of --

17           MR. FOSTER:  Objection; leading, sir.

18           THE COURT:  Sustained.

19    BY MR. KUNZ:

20    Q.  Did you have any agent present executing the search who

21    had not gone through the procedure that you talked about?

22    A.  No, not that I'm aware of.

23    Q.  And during the execution of the search, were you

24    contacted by any of the agents there with respect to various

25    items that were found as to whether they should or should not

1  be seized?

2  A.  Yes.

3  Q.  And what did you make that determination -- base your

4  determination on?

5  A.  Based on the facts that had been laid out in the

6  affidavit and the facts of the case as I knew them.

7  Q.  And if, in fact -- let me ask you this:

8      Did you consider whether any of the items that were being

9  seized if they would be part of the evidence, fruits, or

10 instrumentalities relating to the crimes that were described

11 in Exhibit B -- Attachment B?

12 A.  Can you ask the question again?

13 Q.  Yes.  In making your determination of whether items

14 should be seized from that location, did you do that in

15 consideration of the named criminal offenses that were in the

16 first paragraph of Attachment B?

17 A.  Yes.

18 Q.  And so the court understands in terms of the residence

19 there that you searched, did you take every single document

20 out of that house?

21 A.  No.

22 Q.  Okay.  Can you explain to the court the interior of the

23 house, what items were there and what was not taken by you

24 and other agents?

25 A.  There was three floors to the townhouse.  The ground

1    floor, the basement, had literally hundreds of boxes of

2    documents and records all located and cataloged or put in

3    boxes throughout there.

4         There was an office on the second floor.

5         There was also a kitchen-den area which had records in

6    it.

7         Then upstairs in the bedrooms there was also records and

8    items located up there.

9         What we took was a small amount and only in accordance

10   with what we were looking for as outlined in the affidavit.

11   Q.   And, for example, was there a garage to this location?

12   A.   Yes, there was.

13   Q.   Were there numerous documents and boxes of documents in

14   the garage?

15   A.   Hundreds.

16   Q.   And you didn't seize any of those?

17   A.   No, sir.

18   Q.   Again, so if you would explain to the court, what was the

19   determining factor about whether you would seize a specific

20   document or folder?

21   A.   If it fit within the framework of the allegations and the

22   statutes that we were looking at with regard to those

23   allegations.

24   Q.   And that included the names of -- the names of the

25   alleged victims in the case?

1    A.   Yes, sir.

2    Q.   In fact, you were looking for items that belonged to a

3    Colby Miller; is that correct?

4            MR. FOSTER:  Objection to leading, sir.

5            MR. KUNZ:  I'll rephrase it, Judge.

6            THE COURT:  All right.

7    BY MR. KUNZ:

8    Q.   Can you explain -- the search warrant, were you looking

9    for any items with respect to any individuals?

10   A.   Yes, I was.

11   Q.   Okay.  What individuals were they?

12   A.   Colby Miller had turned over some personal property to

13   Ms. Giovanni, and we were looking for the items that he had

14   told us that he had turned over to her.

15   Q.   Okay.  And were you looking for any items relating to any

16   specific company or companies?

17   A.   We were, several.

18   Q.   Okay.  And were those companies linked to Ms. Giovanni

19   that were mentioned in the affidavit?

20   A.   Ms. Giovanni and others, yes.

21   Q.   Now, were you also looking for financial documents

22   related to the financial transactions that were described in

23   the affidavit?

24   A.   Yes.

25   Q.   And did you find any of those?

 1   A.   Yes.

 2   Q.   And did you find electronic devices in the residence?

 3   A.   A lot of them.

 4   Q.   Okay.  And "a lot," how many are we talking about?

 5   A.   They are all on an FD-597.  I can't give you the number

 6   off the top of my head, but there was a lot.  There was more

 7   than 30.

 8   Q.   And that would include -- what did that include?  When

 9   you talk about electronic devices, what are we talking about?

10   A.   There were cell phones, thumb drives, hard drives,

11   computers, a couple of stacked hard drives, which could have

12   been used as servers and so forth.

13   Q.   And now those items were -- what was your plan with

14   respect to what you were going to do with those electronic

15   items that may or may not have information linked to the

16   search warrant?

17   A.   Without going through the devices on site, which would

18   have taken a long time, the items were seized and then later

19   put into evidence and then reviewed at a later time in the

20   case.

21   Q.   And, in fact, in the affidavit you or Agent Frank listed

22   a procedure that was going to be done with respect to

23   electronic devices; is that correct?

24   A.   That's correct.

25   Q.   And as these items were seized, did you, in fact, go

1   through these various items and look for relevant information

2   relating, again, to the search warrant?

3   A.  Yes.

4          MR. KUNZ:  Thank you, Agent Borghini.

5          THE COURT:  Cross-examine?

6          MR. FOSTER:  Thank you.  Judge, we have the 302 which

7   the agent prepared of the search; but we would ask, if there

8   are any additional 26.2 materials, that they be turned over.

9          MR. KUNZ:  As to this witness testifying, no.

10                        CROSS-EXAMINATION

11  BY MR. FOSTER:

12  Q.  Good morning, sir.

13  A.  Good morning.

14         MR. FOSTER:  Judge, may I place a copy of the search

15  warrant before the witness?

16         THE COURT:  You may.

17         MR. FOSTER:  I have an extra copy if you want it.

18         THE COURT:  I should have it.

19         MR. FOSTER:  It's attached to the warrant.  It's

20  attached to the motion, rather, but --

21         THE COURT:  It's the affidavit?

22         MR. FOSTER:  It is the affidavit.

23         THE COURT:  It's Document 76-1.

24  BY MR. FOSTER:

25  Q.  Agent Borghini, if I understand correctly, you are the

1  draftsman of the affidavit, at least the first part of it,

2  the first draft of it?

3  A.  Yes, I did an initial draft.

4  Q.  And then did I understand further that you worked with

5  the affiant, Mr. Frank?

6  A.  Yes.  As he and AUSA Burke from the Eastern District

7  worked on it and incorporated changes particular to their

8  district, I was then emailed or provided copies at some point

9  to review those or saw what was -- what they had done.

10 Q.  So you reviewed everything before it was presented to the

11 judge?

12 A.  As far as I know, they had provided me additional copies

13 and what I saw was sent to the judge.

14 Q.  Do you remember a gentleman named Clark Onstad?

15 A.  I do.

16 Q.  And Clark Onstad is a defendant in this case?

17 A.  He is.

18 Q.  Do you recall having interviewed Clark Onstad in

19 September of 2016?

20       MR. KUNZ:  I'm going to object to this.  It' not

21 relevant to his *Franks* allegation.

22       MR. FOSTER:  Yes, it is.  I'm just doing a lead-in.

23       THE COURT:  All right.  I'll overrule the objection;

24 but, look, here's the concern, you don't get to depose the

25 agent so --

1    MR. FOSTER:  Here's where I'm going, Judge.  In the

2    302 of Onstad, he's asking Onstad about her business address

3    on Pennsylvania Avenue.  That's where I'm going.  I have a

4    copy if the court wants.

5    BY MR. FOSTER:

6    Q.  Let me show you what we're going to mark as Exhibit 1.

7    Take a look at Exhibit 1, please, and tell me if you

8    recognize that.

9    A.  It's my 302 of the interview of Mr. Onstad.

10   Q.  Okay.  And take a look, please, at page 7 of that 302,

11   talking about -- one, two, three -- four paragraphs up from

12   the bottom.

13       Are you there, beginning with "Onstad"?

14   A.  I have it; yes, sir.

15   Q.  Okay.  So, correct me if I'm reading this wrong, "Onstad

16   was asked about the office Giovanni had located on the tenth

17   floor of a building at Pennsylvania and 17th in Washington,

18   D.C."  Did I read that correctly?

19   A.  You did.

20   Q.  So you asked Mr. Onstad in September of 2016 about an

21   office which she had in Washington, D.C.; is that correct?

22   A.  I did.

23   Q.  So you knew about that office, didn't you?

24   A.  I did.

25   Q.  Did you mention that office to AUSA Burke?  Was that a

1   gentleman or a lady?

2   A.   Mr. Burke.

3   Q.   Mr. Burke.   Did you mention that to Mr. Burke when you

4   were discussing with him what was going into the search

5   warrant?

6   A.   I do not know.

7   Q.   It's not in the search warrant, is it?

8   A.   It is not in there.

9   Q.   It's not in the affidavit, is it?

10  A.   It is not.

11  Q.   And you knew when it went to the judge that it wasn't in

12  there, didn't you?

13  A.   Yes.

14  Q.   Did Mr. Frank know that as well?

15  A.   I'm not sure.   He had access to the case file, and there

16  is this 302 plus other mentions of this address in there.

17  Q.   Okay.   Are you aware further of an interview which

18  occurred in December of 2015 of Ms. Giovanni in Iraq?

19  A.   Yes.

20  Q.   And there was a 302 of that interview prepared by Special

21  Agent Connelly?

22  A.   Is it the 15th or the 14th?

23  Q.   This is the 15th.

24         MR. FOSTER:   Do we have an extra copy of this?

25         MS. SILVER:   Yes.

1          MR. FOSTER:  May I have it?

2          MS. SILVER:  (Handing.)

3   BY MR. FOSTER:

4   Q.  Did you have access to the interviews which had occurred

5   in Iraq prior to January of 2018?

6   A.  Yes.

7   Q.  I haven't stapled this, yet, but I will.  This is my

8   Number 2, my Defendant's 2.  Let me show you what we have

9   marked as Number 2.

10          Is that the interview?

11  A.  It is.

12          MR. FOSTER:  Judge, I would like to offer Number 2

13  into evidence, please.

14          THE WITNESS:  However, I need to point out, the

15  interview was on the 14th.

16          MR. FOSTER:  Okay.  I'm sorry.  December 14th of

17  2015.

18          THE WITNESS:  Yes, sir.

19  BY MR. FOSTER:

20  Q.  But you had it in 2016, right?

21  A.  I had it shortly after it was uploaded into the system.

22  Q.  And you had it prior to the affidavit being submitted to

23  the Magistrate Judge, correct?

24  A.  I did.

25  Q.  Take a look at the top line.  I have it highlighted.

1  "Amanda Giovanni, date of birth, residence --"

2          THE COURT:  Yeah, don't read that out loud.

3          MR. FOSTER:  Okay.

4  BY MR. FOSTER:

5  Q.  It lists a work address, doesn't it?

6  A.  It does.

7  Q.  That's a physical location, isn't it?

8  A.  It is.

9  Q.  That's an actual office, correct?

10  A.  It is.

11  Q.  It's not a virtual office?

12  A.  It's pretty close.

13  Q.  It's an actual office, isn't it?  It's not a P.O. box.

14  A.  It's a physical office; yes, it is.

15  Q.  So you knew that she had a physical office as early as,

16  when?  When did you first see this 302?

17  A.  It was uploaded into the system, it looks like, on about

18  12/30.  So right around the beginning of probably 2016.

19  Q.  Would Agent Frank have been familiar with that 302 as

20  well?

21  A.  He reviewed the file.  So this is one of the documents he

22  could have reviewed.

23  Q.  Agent Borghini, is there a single reference in the

24  affidavit to a business meeting ever occurring at the home on

25  Alicia Court?

1   A.   Mr. Miller described meeting there, and there were other

2   individuals at those meetings at her house.

3   Q.   He described having a business meeting there?

4   A.   Yes.   There would be business meetings, because the

5   individuals involved at those locations were, number one,

6   employees of Ms. Giovanni, as well as other individuals which

7   she engaged in financial transactions with.

8   Q.   Is Mr. Miller -- in your affidavit, is there any date as

9   to when he says those meetings occurred?

10  A.   I'm not sure if they are in there.   There's probably a --

11  there would be time frames.

12  Q.   You want to take a look at paragraph 12?

13  A.   Of which document, sir?

14  Q.   The affidavit.

15  A.   Are we talking about page 5?

16  Q.   We are.

17  A.   Okay.   And what are you -- and you're referring me to

18  what page or paragraph?

19  Q.   I'm referring you to paragraph 12.

20  A.   Yes.

21  Q.   Is there any reference to any specific meetings or any

22  specific business documents which Mr. Colby Miller informed

23  you were present in Ms. Giovanni's home?

24  A.   It refers to computers being observed there, boxes full

25  of documents, employees and assistants being there.

1  Q.  I understand that, but my question was a little bit more

2  pointed, sir.

3      Did Mr. Miller, rather -- not Mr. Miller.  Did you put in

4  this affidavit any reference to a specific business meeting

5  ever occurring at this location or any specific business

6  documents that were identified to you by Mr. Miller that he

7  observed at this location?  I don't see it, I'm not arguing

8  with you, I don't see it, but if it's in there --

9  A.  Reading the totality of the paragraph, that's what I'm

10  describing there, is that they are conducting business there,

11  and I think I also put in there that there were multiple

12  meetings being held at that location.

13  Q.  You did?

14  A.  And there's also described there's an office in there.

15  People can have offices in more than one location.

16  Q.  Do you describe any business meeting which occurred at

17  this house regarding Mr. Miller?  Mr. Miller could be at the

18  house for any number of reasons, right?

19  A.  Correct, including business meetings.

20  Q.  Including, but you don't say that on X, Y, Z date he was

21  present, he observed Ms. Giovanni working on the computer,

22  working on a BIDS contract?

23  A.  No, I didn't get that specific with it, no.

24  Q.  You don't put in there that Mr. Miller was there, and he

25  observed documents in the name of BIDS or in the name of any

1   other individual that was being investigated, do you?

2   A.   No.

3   Q.   Okay.  You just make this general statement as to his

4   observations, correct?

5   A.   Yes.

6   Q.   And when was the last time, to your knowledge, Mr. Miller

7   was at this home?

8   A.   Probably October -- late September or October 2015.

9   Q.   Okay.  And Ms. Giovanni left the country in October of

10  2015; is that correct?

11  A.   Correct.

12  Q.   And she didn't come back until October of 2016; is that

13  correct?

14  A.   Correct.

15  Q.   Were you part of the surveillance team that saw her on

16  December 22, 2016?

17  A.   I was not.

18  Q.   Do you have anything in the affidavit which places

19  Ms. Giovanni at the home prior -- from October 23, 2016, to

20  December 2017, do you have anything which places her at the

21  home in this affidavit?

22  A.   Ask the question again.

23  Q.   Yeah.  She left the country on October 23, 2016 -- 2015?

24  A.   2015.

25  Q.   And she comes back to the country October 1, 2016,

1  correct?

2  A.  Correct.

3  Q.  She was gone continuously during that time, right?

4  A.  Correct.

5  Q.  There is a reference in the affidavit to a surveillance

6  being conducted where she's observed outside the house on

7  December 22, 2016.

8  A.  Correct.

9  Q.  You were not part of that surveillance?

10  A.  I was not.

11  Q.  And is it also in the affidavit that she came into the

12  country on December 1st into Detroit?

13  A.  October 1st.

14  Q.  October 1st, I'm sorry.

15  A.  Correct.

16  Q.  So she flew back into the States on October 1, 2016,

17  correct?

18  A.  Correct.

19  Q.  Is there anything in the affidavit which puts her at that

20  house in Washington, D.C., prior to December 22, 2016?

21  A.  Mr. Badaoui, when he came into the country later in

22  October, said that she resided at that residence.

23  Q.  Did he say when she resided there?

24  A.  I assume she was --

25  Q.  No, no, don't assume.  What's in the affidavit?  Because

1   that's, you know, right, we all know that you have to rely on

2   what's in the affidavit.

3   A.  There is a reference to him --

4   Q.  What paragraph, sir?

5   A.  Thirty-three.  "The investigation has revealed that on

6   October 23, 2015, she left --"  Sorry.  Where is Mr. -- I'm

7   looking for the paragraph where I reference Mr. Badaoui

8   coming back into the country.

9           MR. FOSTER:  Maybe Mr. Kunz can look at it at the

10  same time and can find it.

11          MR. KUNZ:  Paragraph 49.

12          THE WITNESS:  There you go.  October 29th.

13  BY MR. FOSTER:

14  Q.  Okay.  He arrived.  "On October 29, 2016, Badaoui arrived

15  at Dulles and gave his address as Quantrell Avenue.  When

16  questioned about Alicia Court, stated that his business

17  partner lives at that address."

18      How long had Mr. Badaoui been out of the country before

19  he arrived back in?

20  A.  He said he had been out of the country for two months.

21          THE COURT:  Maybe I'm missing something here, but,

22  look, what we're looking for is particularity issues; but with

23  respect to *Franks*, you're looking for things that were

24  materially left out or things that were false.

25          MR. FOSTER:  Yes.

*Lawrence Borghini - Cross*

1          THE COURT:  We're not really having a hearing on

2   whether he knew enough to constitute probable cause.  The

3   Magistrate Judge already decided that.

4          MR. FOSTER:  Correct, sir.  Okay.  I'll move on.

5   BY MR. FOSTER:

6   Q.  Based on your investigation, how long did Ms. Giovanni

7   have the address on Pennsylvania Avenue?

8   A.  Not long.

9   Q.  Not long?  What is "not long" to you?

10  A.  From the time she received fraud proceeds till sometime

11  in March when she stopped paying the bill.  It may even have

12  been February.

13  Q.  Let me show you what I will mark as Exhibit 3, which is

14  an invoice, and ask you if this refreshes your recollection

15  as to that.

16      Do you know what Servcorp is?

17  A.  I do.

18  Q.  What is that?

19  A.  That's the business that's responsible for the leasing of

20  the office spaces in this building.

21  Q.  And you had access to the Servcorp billing of

22  Ms. Giovanni, did you not?

23  A.  Some agents visited that location, yes.

24  Q.  Does that refresh your recollection as to the term of the

25  lease that she had with Servcorp?

1   A.   I see an invoice for October 30th.

2   Q.   October 30th, what year, sir?

3   A.   2015.

4   Q.   And when does it show vacating?  Isn't that March?

5         MR. FOSTER:  May I approach the witness, sir?

6         THE COURT:  You may.

7         MR. FOSTER:  It's another document.

8         MR. KUNZ:  If we can move this along, I'll stipulate

9   as to March of 2016.

10         MR. FOSTER:  That's correct, and we'll take the

11   stipulation.

12         MR. KUNZ:  We're spending a lot of time on --

13         THE COURT:  So she moved out March 2016?

14         MR. FOSTER:  Yes, sir.

15   BY MR. FOSTER:

16   Q.   Were you aware of the report which was generated by the

17   U.S. Customs inspector upon her interview and detention of

18   Ms. Giovanni when she came into the United States?

19   A.   Yes.

20   Q.   Were you aware of that prior to you writing the affidavit

21   for the search warrant?

22   A.   Yes.

23   Q.   Had you reviewed the documents which the agent had copied

24   and forwarded?

25   A.   I'm trying to remember exactly when I saw all of the

1  documents that had been copied.  It would probably have been

2  in at the latest November.

3  Q.  November of what year?

4  A.  2016, sir.

5  Q.  You're aware that the Customs official reported that

6  Ms. Giovanni came back into the United States with three cell

7  phones and two external hard drives, are you not?

8  A.  Correct.

9  Q.  No computers?

10 A.  Correct.

11 Q.  Did you include that in your affidavit?

12 A.  I did not.

13 Q.  Did you tell that to AUSA Burke?

14 A.  I'm not sure if they ever saw that information.

15 Q.  Whether they saw it, but do you remember discussing it?

16 A.  I don't recall giving it to them, and I'm sure if it was,

17 you know, if that's something that Mr. Frank had located in a

18 file and made available to him.

19 Q.  Just to put this in perspective, she left the United

20 States in October of 2015, and she came back to the United

21 States October 1, 2016.  And according to this Customs

22 report, when she came back she had three cell phones and two

23 external hard drives, correct?

24 A.  Correct.

25 Q.  No mention of any computers, correct?

1  A.  Correct.

2  Q.  And you didn't include that in your affidavit?

3  A.  I did not.

4  Q.  Did you tell Mr. Burke that she had been the subject of

5  an extended Customs search and seizure of documents?

6  A.  I can't answer that, because I don't recall doing it.

7  Q.  You don't recall either way?

8  A.  Correct.

9  Q.  Now I'm going to change and talk about the particularity

10 for a minute or a couple of minutes.  That's Exhibit B to the

11 search warrant affidavit.  Do you have that in front of you?

12 I think it's B.

13 A.  I do.

14 Q.  The attachment?

15 A.  I do.

16 Q.  Okay.  You drafted this?

17 A.  I drafted the affidavit.

18 Q.  Who drafted this?

19 A.  I'm not sure if this was something done by the district;

20 but, typically, when I do draft an affidavit, I will outline

21 the attachments.  I'm not sure if they used my -- the outline

22 I used or if they prepared their own.

23 Q.  Have you had the chance to say anything yea or nay or

24 make any criticisms or adjustments to this before it was

25 submitted to the judge?

1  A.  I believe I did see this in a draft form, yes.

2  Q.  So, again, this goes to the court, apparently, on

3  January 6, 2017.  That's what it appears from the front page.

4  Do you see that?

5  A.  Yes, sir.

6  Q.  All right.  Now, in April 2016 you had already executed a

7  search warrant for Ms. Giovanni's emails, had you not?

8  A.  One of the agents assisting in the case or co-agent did,

9  yes.

10  Q.  And had you received those things, those emails by

11  January of 2017?  Is that Agent Pekerol who did that search

12  warrant?

13  A.  Yes.  And I can't remember if he had already provided

14  those -- when he provided to me those documents or those

15  emails.

16  Q.  Is he working jointly with you on this case?

17  A.  He is.

18  Q.  Did he review a draft of this affidavit before it was

19  submitted to the Eastern District?

20  A.  I don't know.

21  Q.  Well, did you discuss it with him?

22  A.  I'm not sure, because he's located in Pensacola, and I'm

23  not sure.  I'd have to go back and look and see if he was

24  included in any of the emails or if I asked him to do that.

25  Q.  Do you ever talk to him by phone?

1    A.  I do.

2    Q.  My point is that none of the information that was gained

3    or that appeared from the search of the emails in any way was

4    used to narrow this list of items to be seized, was it?

5    A.  I didn't incorporate any information from there, no.

6    Q.  But the government had that since April of -- what? --

7    2016?  I have April 8, 2016.

8    A.  If that's what you have, I have nothing to dispute that.

9    Q.  You had also done a search of Mr. Onstad's apartment, had

10   you not?

11   A.  I did.

12   Q.  And when was that?  I have --

13   A.  October or September 23rd, 2016.

14   Q.  Did you seize items?

15   A.  We did.

16   Q.  Were you out there?

17   A.  I was.

18   Q.  Did you use any of the information you learned from the

19   search of Mr. Onstad's apartment to draft the list of items

20   to be seized?

21   A.  Mr. Onstad did have a document in his possession, and

22   there was additional documents -- copies of that document

23   that I thought -- or that I -- it was reported that

24   Ms. Giovanni had additional copies of that document.

25   Q.  What I'm trying to ask and maybe inartfully is that did

1    you narrow your list of items to be seized in any way based

2    upon your review of the documents which were seized from

3    Mr. Onstad?

4    A.   No.

5    Q.   Did you narrow your list of items to be seized in any way

6    based upon your interview of Mr. Onstad?

7    A.   No.

8    Q.   In fact, if we look at Attachment B, list of items to be

9    seized, I've read it and maybe you can help me.  The name of

10   "Giovanni" doesn't appear at all in Attachment B, does it?

11   A.   It does not.

12   Q.   How about the name of any companies or corporations which

13   were associated with her?

14   A.   No, but there's plenty of reference back in the

15   affidavit.

16   Q.   Okay.  We'll talk about that in a couple of minutes, but

17   I'm talking about the list of items to be seized.  It's not

18   in there, is it?

19   A.   No, sir.

20   Q.   In fact, Mr. Miller's name is not even included in

21   Exhibit B, is it?

22   A.   It is not.

23   Q.   When did Mr. Miller meet Ms. Giovanni?  Was it July 2016?

24   A.   No.  It would have been -- I believe it's July of 2015.

25   Q.   So is it fair to say that any illegal contact between

1   Ms. Giovanni and Mr. Miller would go back as far as July of

2   2015, alleged?

3   A.  I'm not sure what contact they had prior to that.  That's

4   when Mr. Miller described his in-person meeting with her.  I

5   don't know if they had contact prior to that in the form of

6   email or phone calls or associates of Ms. Giovanni.

7   Q.  Isn't it true that you wrote in your affidavit to search

8   Mr. Onstad's house that in July of 2015 Onstad introduced

9   Miller to his new business partner Amanda Giovanni?

10  A.  Yes.

11  Q.  Exhibit B doesn't contain any time frame, does it?  That

12  is, going back to 2012, 2013, 2011, there's no time frame

13  there at all, is there?

14  A.  It does not, no.

15  Q.  You've been around 22 years, correct?

16  A.  Correct.

17  Q.  Working criminal cases?

18  A.  Yes, sir.

19  Q.  You've done search warrants and participated in search

20  warrants, correct?

21  A.  A lot of them.

22  Q.  A lot of them.  Do you typically leave out any reference

23  as to the time frame for the items to be seized?

24  A.  It depends on the district.

25  Q.  So you're saying that the district up there, their policy

1    was to leave out any time frame?

2    A.   I'm saying, if you go through that district up there,

3    you're likely to find other search warrants that have

4    attachments similar to this.

5    Q.   I'm not in a position to do that.  But does your draft

6    have -- do I understand your testimony that your draft had a

7    limitation as to time frame, and that was removed by the

8    lawyers for the Eastern District of Virginia?

9    A.   I don't know about that.  I didn't go back and review

10   what I initially submitted to them.

11   Q.   Well, you knew we were having a hearing today, right?

12   A.   Yes.

13   Q.   Okay.  So you don't remember one way or the other whether

14   the draft you sent up to Virginia had any type of time frame

15   limitation?

16   A.   No, sir.

17   Q.   Do you recall if the draft you sent up to Virginia had

18   any reference in Attachment B to Ms. Giovanni, to Mr. Miller,

19   to BIDS, or to any of the companies they were associated

20   with?

21   A.   Once again, I cannot answer that question, because I did

22   not go far enough back to look at that.

23   Q.   Was the affidavit on premises at the time of the search

24   warrant?

25   A.   Yes.

1    Q.   It was under seal, wasn't it?

2    A.   It was.

3    Q.   So did you have the affidavit with you?

4    A.   I did.

5    Q.   Do you recall that?

6    A.   Yes.

7    Q.   Okay.  Do you recall -- well, let's take a look at the

8    inventory in this case.  It was a rather extensive inventory,

9    was it not?

10   A.   There were a number of pages.

11   Q.   Here it is.

12        MR. FOSTER:  May I approach the witness, please, sir?

13        THE COURT:  You may.

14   BY MR. FOSTER:

15   Q.   Let me show you this.  I'm a little bit unorganized here,

16   I apologize for that.  I'm looking for an exhibit tab.  I

17   think we are up to Number 4.  Take a look at Number 4 and

18   tell me if that's the inventory.  Is that it?

19   A.   What I'm having difficulty with, it looks like you have a

20   partial inventory, then you've got another sheet, then you've

21   got another inventory, and you don't have all of the numbers

22   on the top.  So I'm trying to sequentially look at -- this is

23   what you handed me, Mr. Foster.  As I said, it's a little

24   confusing.  I'm trying to separate it out and give you an

25   accurate picture.

1   Q.  All right.  Take your time.

2   A.  The last seven pages is the inventory, yes.

3   Q.  The last seven pages?

4   A.  Yes.

5   Q.  So seven pages of inventory?

6   A.  Correct.

7   Q.  How many total items were seized?

8   A.  What's confusing is there's listed nine here.  The way

9   you have the exhibit set up, it's confusing, and I'm not sure

10  if it's complete.

11  Q.  Well, that's the way I got it, so --

12  A.  Well, that's --

13  Q.  Suffice to say, there are dozens and dozens and dozens of

14  items, correct, seized?

15  A.  From what I recall, there's over a hundred items; yes.

16  Q.  A hundred items.  Was there any limitation, when the

17  items were seized, not to reach back beyond let's say 2015

18  when Ms. Giovanni first met Colby Miller?

19  A.  State your question again.

20  Q.  Yes.  We established that Ms. Giovanni met Colby Miller

21  in July or so of 2015, correct?

22  A.  Correct.

23  Q.  So were there any items seized that were dated or related

24  to a time frame prior to July of 2015?

25  A.  Yes.

1   Q.   Were there any items related in 2014?

2   A.   Yes.

3   Q.   2013?

4   A.   Yes.

5   Q.   2012?

6   A.   Yes.

7   Q.   2011?

8   A.   Some of the boxes contained multiple years of documents.

9   So document -- boxes that had relevant documents in it were

10  seized, and some documents predated back to 2012.  There may

11  be some even earlier than that, but they're in with relevant

12  documents of items that were pertinent to the investigation.

13  Q.   So when the agents came to you and said, "Agent Borghini,

14  you know, we have this box, and there's documents from 2012,

15  2013, should we take it," you told them yes?

16  A.   If it had relevant documents, yes.

17  Q.   There was nothing in the search warrant affidavit or the

18  judge's order which said you couldn't do that, was there?

19  A.   Correct.

20  Q.   And the computers -- computers were seized; is that

21  correct?

22  A.   Yes, sir.

23  Q.   Okay.  And was there any attempt made to limit review of

24  documents or information on the computers to a time frame no

25  earlier -- was there any attempt to limit the review of

1  information on the computers to July 2015 forward?

2  A.  What you're asking about is -- and you have in

3  discovery -- there was -- there was three categories set out.

4  Computers that had -- that were in use at the time were

5  forensically examined, some Cellebrite investigation was

6  done, and there were some items, cell phones and so forth,

7  that were Cellebrite examinations conducted on it.  And then

8  there was a bunch of other electronic devices that there were

9  previews done and information was recorded in -- documented

10 in a way that made it convenient for the defense to view and

11 determine if there was anything relevant that they wanted off

12 of those.

13 Q.  Well, but the discovery, of course, is not in the

14 courtroom here before Judge Hinkle.  So my question is simply

15 this:

16     Was there any effort made to avoid looking at items on

17 the computer that predated July of 2015?

18 A.  Yes.  You can set up filters when you're reviewing it for

19 evidence review and determine what period of times and what

20 you want to look for and search terms you want to look for.

21 Q.  So the FBI did not review anything on the computers or

22 the cell phones that was dated prior to July of 2015?

23 A.  No.  There was.  I mean, I saw stuff on there prior to

24 2015.

25 Q.  How about from 2014?

1   A.  There were documents on there, you could see that they

2   were predated to that.  Did I go in and look at those

3   documents?  No.  Did I go in and do search terms and locate

4   documents within that time frame and a date?  Yes.  And that

5   was in the relevant time period described.

6   Q.  Did you know that Ms. Giovanni had a bank account or bank

7   accounts at Bank of America?  Did you know that?

8   A.  Yes.  There's some documents that had been seized, hard

9   documents as well as subpoenaed.

10  Q.  Let me show you what's been marked as Defendant's 5,

11  which is a subpoena to Bank of America.  Do you see that?

12  A.  Yes, sir.

13  Q.  And what's the date of the subpoena that went to Bank of

14  America?

15  A.  December 1st, 2015.

16  Q.  And it's plainly before January of 2017, correct?

17  A.  It was.

18  Q.  So had you received those bank documents -- did you and

19  Agent Pekerol receive those bank documents before January

20  of 2000 -- I get my dates all screwy here, I apologize.

21      Did you receive those documents before the search warrant

22  that was executed in January of 2017?

23  A.  I can't give you the exact date, but I will say yes.

24  Q.  Was there any effort made to limit Attachment B, the

25  items of things to be seized, based upon your review or the

1    team's review of the items from Bank of America?

2    A.  Well --

3    Q.  Sir?

4    A.  I don't understand your question.

5    Q.  So you get the items back from Bank of America, correct?

6    A.  Correct.

7    Q.  Upon reviewing the items from Bank of America, did you

8    say, "Well, I have to go and adjust what I'm telling the

9    judge I'm looking for because I have additional information

10   from these subpoenas that's important for the judge to know"?

11   Did you do that?

12   A.  No.

13   Q.  The time frame for the search of the Bank of America

14   records is from what date to what date?  I think I

15   highlighted it.

16   A.  For the period December 1st, 2015, to the present.

17   Q.  So you were asking for bank records from December 1,

18   2015, to the present, right?

19   A.  Correct.

20   Q.  Why is that?

21   A.  I think this is the second subpoena that was served on

22   them.

23   Q.  Well, what time frame did the first subpoena ask?

24   A.  I can't recall.

25   Q.  Are you sure there's a first subpoena or you think there

1  is?

2  A.  You're going to have to ask Agent Pekerol that, because

3  he was handling it.

4  Q.  May I see what you have in front of you?

5  A.  Yes.

6  Q.  It's the same thing.  Okay.

7          MR. FOSTER:  May I have one moment, please?

8          THE COURT:  You may.

9  BY MR. FOSTER:

10  Q.  One final question.  You talked about boxes that were in

11  Giovanni's garage?

12  A.  Yes.

13  Q.  Weren't those boxes mostly empty?

14  A.  Some were.

15  Q.  Did you take photographs of them?

16  A.  Yes.

17          MR. FOSTER:  That's all I have, Judge.

18          THE COURT:  Redirect?

19          MR. KUNZ:  Briefly, Judge.

20                    REDIRECT EXAMINATION

21  BY MR. KUNZ:

22  Q.  Mr. Foster had asked you about if, in fact, you told the

23  Eastern District, in preparing the affidavit, concerning the

24  October 1 seizure of items or papers from Ms. Giovanni; is

25  that correct?  Do you remember being asked that question from

1    Mr. Foster?

2    A.   Yes.

3    Q.   And you weren't sure if you had.  But if you look at --

4    do you have the affidavit before you?

5    A.   I do.

6    Q.   If you look at paragraph 48, going to page 20 into

7    page 21.  In fact, it's included in the affidavit that

8    numerous papers or documents were possessed by Ms. Giovanni

9    when she came into the country; is that correct?

10   A.   Yes.

11   Q.   And counsel also asked you with respect to the possible

12   boyfriend, Mr. Badaoui, right?

13   A.   Yes.

14   Q.   Let me back up one second.

15       Counsel had asked you about whether you included

16   information about the search that was done for Ms. Giovanni's

17   email account.  Do you remember that?

18   A.   Yes.

19   Q.   Okay.  And paragraph 38 of the affidavit, does that

20   include information concerning that?

21   A.   Yes, it talks about it there.

22   Q.   And counsel had asked you with respect to whether you had

23   included any information concerning the introduction of

24   Ms. Giovanni to Mr. Miller by Mr. Onstad.  Do you recall that

25   question?

1   A.  Yes, I do.

2   Q.  And on paragraph 8 of the affidavit, did that include

3   that information?

4   A.  It does.  It says in July of 2015.

5   Q.  Now, sir, with respect to the electronic devices that

6   were seized, I think you were trying to explain the procedure

7   that you did.  Were you looking for -- what were you looking

8   for in the electronic devices --

9   A.  Emails --

10  Q.  -- that were seized, once you had them in your custody?

11  A.  I was looking for emails, documents, and any type of

12  communications, depending on what device you're using,

13  between various individuals.

14  Q.  And was that relevant to charges that were in Exhibit B

15  listed in that first paragraph?

16  A.  Yes.

17          MR. KUNZ:  May I approach the witness, Your Honor?

18          THE COURT:  You may.

19  BY MR. KUNZ:

20  Q.  Let me show you this.  This is the inventory.  Is this

21  what you were looking for, the search warrant inventory, the

22  numbers, that counsel was showing you?

23  A.  That's split up, but this here is more complete, yes.

24  Q.  How many items were seized according to this?

25  A.  105.

1    Q.   Okay.

2              MR. KUNZ:   Thank you, Your Honor.

3              THE COURT:   Thank you, Mr. Borghini.   You may step

4    down and return to counsel table.

5                        *   *   *   *   *   *   *   *

6              MR. KUNZ:   Oh, yes, sir.   I'm going to call Agent

7    Borghini.

8              THE COURT:   All right.

9              MR. KUNZ:   Can Agent Brooks be excused?

10             THE COURT:   If nobody needs him, certainly.

11             Mr. Borghini, you are still under oath.

12             Mr. Kunz, you may proceed.

13             MR. KUNZ:   Just one second, Judge.

14        (**LAWRENCE BORGHINI**, having been previously duly sworn, was

15   recalled by the government.)

16                            DIRECT EXAMINATION

17   BY MR. KUNZ:

18   Q.   Sir, on January 11, 2017, did you participate in the

19   execution of a search warrant at the defendant's residence in

20   Alexandria, Virginia?

21   A.   I did.

22   Q.   Now, prior to agents entering the house, did you do

23   anything in terms of trying to reach out for Ms. Giovanni?

24   A.   Yes.   I was aware of two numbers that Ms. Giovanni used:

25   one having a 202 number and one having a 703 number.   I tried

*Lawrence Borghini - Direct*

1  calling one number first, let it ring until it went to

2  voicemail.  I then tried the secondary number.  I let that

3  number ring until it went to voicemail.  I then went back and

4  called the first number that I called a second time.  That

5  phone rang until it went to voicemail.  Then I alternated

6  back to the last number I tried, the 703 number I believe,

7  and I let that phone ring until it went to voicemail.

8  Q.  And both were cell phones that you're aware of?

9  A.  Yes, sir.

10  Q.  So did you tell the other agents that you could not reach

11  her?

12  A.  Yes.  That was the protocol that we had briefed, if we

13  were unable to raise them via telephone, at that point we

14  would start the knock-and-announce procedure.

15  Q.  Okay.  And did you hear the agents announce themselves

16  outside the door before the door was breached?

17  A.  Yes.  They started knocking on the door and announced.

18  Q.  And were they shouting fairly loud?

19  A.  Loud enough so that if you were -- they were knocking

20  loud enough so that if you were inside of the residence you

21  would have known it, and they were announcing themselves loud

22  enough.  As a matter of fact, some of the neighbors actually,

23  I think, came to their doors.

24  Q.  Where were you when this was occurring?

25  A.  There's a driveway, and then there's a straight pull in

1    that dead ends.  The vehicles had -- the entry team had come

2    in with their vehicles, and myself and Mr. Pekerol had come

3    down a little bit further.  We were standoffish in that

4    alleyway there.

5    Q.  Could you see the house, the townhouse from where you

6    were?

7    A.  Yes.

8    Q.  And with respect to while they were knocking on the door,

9    did you see anybody come to the windows?

10   A.  There was some movement in one of the upper bedroom

11   windows above the agents, and it was clearly -- based on

12   training, it became a safety issue as far as I was concerned,

13   because now you have somebody above agents who are knocking

14   at a front door, and they definitely had a tactical position

15   over the agents that were trying to gain entry.

16   Q.  Once the door was breached, where did you go?  Were you

17   still there when this happened?

18   A.  I stayed in my position.  I was not part of any plan to

19   move into the residence or do anything.  That was strictly an

20   operation that was conducted by the local field office.

21   Q.  Okay.  And did there come a point in time when you saw

22   any individuals coming outside of the residence?

23   A.  Yes.  Eventually Ms. Giovanni and both the Shallals were

24   brought out of the residence, and then eventually ended up

25   back away from everything in the area of myself, some

1  additional agents, and Mr. Pekerol.

2  Q.  Now, when you observed Ms. Giovanni, can you describe to

3  the court what was she wearing?

4  A.  When she first came there, from what I recall, she had on

5  a black pair of pants.  I thought they were kind of sweat

6  pants or some kind of pants.  She had on some kind of a

7  shirt.  She had on a black tennis shoe or some kind of shoe

8  that she was wearing, and then I think there was something

9  draped over her, whether it was a coat or a blanket.  She had

10  gotten some kind of a coverup they put over her.

11  Q.  Now, while the agents were clearing the house, were you

12  in close proximity to Ms. Giovanni?

13  A.  We were all in that general area down there, yes.

14  Q.  I mean, how far apart are we talking about when you say

15  "general area"?

16  A.  Within a few feet of each other.

17  Q.  And at any time did you make her kneel down in the snow?

18  A.  No.

19  Q.  Can you tell the court, had it snowed the night before

20  when you were there?

21  A.  I was unaware of it snowing, no.

22  Q.  Now, when you first saw Ms. Giovanni, did she have some

23  shoes on or did that happen a little later on?

24  A.  By the time she got back to me, she had shoes on.  She

25  had a black -- what I remember, she had some kind of black

1  shoe on.  It was either a tennis shoe or some kind of shoe.

2  Q.  When you say by the time that she got near you, what

3  period of time are we talking about?

4  A.  It was a matter of a couple of minutes.

5  Q.  And with respect to the Shallal brothers, do you know how

6  they were clothed?  Do you recall how they were clothed?

7  A.  Pants.  One of them had on a heavier shirt and the other

8  one had a lighter shirt.  I think the brother might have had

9  on a lighter shirt.  I asked him if he needed additional

10  clothing or something, and he said no.  I can't remember what

11  Michael Shallal, how he responded.

12  Q.  Now, did you have occasion once -- did you get some word

13  that it was clear, and it was safe for you guys to go inside?

14  A.  Yes.  Once the team had cleared the residence and said it

15  was safe to start setting up to conduct the search and come

16  back inside, that's what we did.

17  Q.  And did you go inside with Ms. Giovanni?

18  A.  Yes.

19  Q.  And when you walked inside with her, was she still

20  cuffed?

21  A.  No.  We removed the handcuffs to bring them back up.

22  Once everything was secure inside, and we were at that point

23  able to determine they didn't have any weapon or anything on

24  them, we were able to take the handcuffs off.

25  Q.  And what happened when you went inside with Ms. Giovanni?

1    A.  At that point the search team started their procedures of

2    setting up and marking the rooms and so forth.

3    Ms. Giovanni wanted me to explain what was going on.  At

4    which point I told her I'd sit down with her and explain what

5    was going on.  Prior -- do you want me to continue on in a

6    narrative?

7    Q.  Yes.

8    A.  We walked back inside.  At that point I brought her to

9    the side and explained to her that we had a search warrant,

10   we had a search warrant for the residence.  I told her that

11   she was not under arrest.  I told her that she was free to

12   leave the residence if she wished.  If she wanted to stay,

13   she could stay, but she had to stay out of the way of the

14   agents.  And that if she wanted to -- she kept wanting to

15   know further information, and I said, "Well, we will sit down

16   and talk," which we did.  Eventually, we sat down and I began

17   to interview Ms. Giovanni.

18   Q.  Let me show you the diagram that government introduced,

19   Exhibit Number 1, and ask you to explain what was going on.

20   If you can explain to the court, where were you and where was

21   she?

22   A.  You mean in this diagram where we were when I sat down

23   and started the interview?

24   Q.  Yes, sir.

25   A.  If you look to the very back right there, you're going to

1    see a chair that's against those windows, and I can't make

2    out what number it is, but it's in the very back at the top

3    of that picture.

4    Q.   The left-hand side, is that what you're talking about?

5    A.   Right there is where she was.  She sat in that chair.

6    Q.   Okay.  You're talking about Number 4, the chair?

7    A.   I can tell there is a number, and that appears to be what

8    the number appears to be, but I marked it with my finger.

9    Q.   My question was:  Did you walk her back to that area

10   first when she wanted to know about what was going on, or did

11   you talk to her somewhere else before you walked back to talk

12   to her?

13   A.   We came back in, and then we went back to that area, yes,

14   because there was a team that was going to use the dining

15   room table there, and they were setting up some computer

16   equipment.  And then the other end of the dining room table,

17   they were going to set up where they were going to log some

18   of the evidence and take care of the evidence function.  And

19   then some of the agents and Mr. Shallal -- both of the

20   Shallals went back to the kitchen, whatever this other room

21   is, sitting room in there.

22   Q.   Let me show you Government's Exhibit Number 2.  Is this

23   the area where you sat down with Ms. Giovanni?

24   A.   Yes.

25   Q.   Okay.  And can you explain to the court, where were you

1   seated and where was she seated?

2   A.  Ms. Giovanni was seated here.

3   Q.  "Here" being where?  I'm sorry?

4   A.  In that big chair.

5   Q.  I see it.

6   A.  Right there.  And then I had a chair that was in this

7   particular area over here, and Mr. Pekerol was somewhere -- I

8   don't know if he had moved the chair, but was over in this

9   particular area there, or might have been sitting on the

10  couch.

11  Q.  Now, were you yelling at Ms. Giovanni?

12  A.  No.

13  Q.  Did you have your voice raised when you were talking to

14  her?

15  A.  No.

16  Q.  Did you command her that she had to cooperate and had to

17  answer questions?

18  A.  Absolutely not.

19  Q.  After you explained what the purpose was for the law

20  enforcement being there and execution of the search warrant,

21  what happened next?  What did you do?

22  A.  Once again I explained to her that we were there to

23  execute a search warrant, she was free to go if she wanted

24  to, and she wasn't required to make any statement.

25  Q.  Okay.  Now, did she ask you anything?  Tell me --

1    A.   She wanted to know what was going on, and then we started

2    having a discussion about Colby Miller and how she became

3    involved with him.

4    Q.   During the time you were having this interview with her,

5    did you have your weapons out?

6    A.   I never drew my weapon at all that day.

7    Q.   Did you threaten her in any way?

8    A.   No.

9    Q.   In talking to her, did she appear to respond to your

10   questions in terms that she understood what you were saying

11   to her?

12   A.   Yes.

13   Q.   Can you describe her demeanor to the court?

14   A.   She was cooperative.  She was wanting to tell what

15   information she had or -- at some point, whenever she needed

16   a break, she was given a break.  She was allowed a smoke

17   break, she was allowed restroom breaks, she was allowed to

18   get food and beverages out of the kitchen if she wanted.  At

19   one point during the interview I asked her if she took

20   medication, if there was any medication she needed to be

21   taking.  It was a standard interview.

22   Q.   Now, did you give her the free rein of her residence

23   while the search was being conducted?

24   A.   No.

25   Q.   Okay.  Why is that?

1   A.   For safety of the agents, the integrity of the search.

2   We can't just allow people to roam around a residence when

3   you have agents in there conducting a search.  One of the

4   things I did notice, when I came into the residence, there

5   was an office off to the right.  In that office there was a

6   set of handcuffs that was somewhere in that room.  There was

7   a set of brass knuckles on the shelf in there.  There was

8   knives in the kitchen and so forth.  It just -- the FBI was

9   there to conduct a search, and our protocol is to control the

10  scene.

11  Q.   And you were also looking for firearms belonging to

12  Mr. Miller; is that correct?

13  A.   That is correct.

14  Q.   And did you find them in the house?

15  A.   Yes.  Did I personally?  No.  The search team did.

16  Q.   Okay.  Now, during your interview of Ms. Giovanni, she

17  provided a number of statements to you; is that correct?

18  A.   That's correct.

19  Q.   How long was your interview with her, do you think?

20  A.   You would have to look at my 302.  I think I noted the

21  times, and I think I noted the time when it ended or when she

22  requested to speak with her attorney.

23          MR. KUNZ:  May I approach the witness, sir?

24          THE COURT:  You may.

25  BY MR. KUNZ:

1  Q.  To refresh your memory, take a look at that document.

2  A.  So the evolution started at 7:07, according to my 302,

3  and at 9:40 Ms. Giovanni requested to call her attorney.

4  Q.  Okay.

5  A.  So to answer your question, I'd say roughly two hours,

6  maybe a little less than two hours.

7  Q.  And during the course of that, at any time did she ask to

8  get up and go to the bathroom or get something to drink?

9  A.  Yes.  She was allowed to get refreshments, she was

10  allowed a smoke break, and she was allowed to use the

11  restroom.

12  Q.  Now, I think you indicated at some point she asked you to

13  reach out to her attorney; is that correct?

14  A.  She wanted to speak with her attorney, yes.

15  Q.  Okay.  And what did you do in response to that?

16  A.  Well, since her phone was being seized, I asked her for

17  the attorney's number.  I then dialed the number and allowed

18  her to use my cell phone and go into the restroom or into her

19  bathroom and privately speak to her attorney.

20  Q.  Okay.  And then after she had spoken to the lawyer, did

21  she indicate to you that she didn't want to talk to you

22  anymore?

23  A.  Yes, she said she was done talking.

24  Q.  And you respected that?

25  A.  Yes, sir.

1  Q.  Now, when you were interviewing Ms. Giovanni in this Room

2  E, could you -- did you know where the Shallal brothers were

3  being interviewed?

4  A.  I knew they were in the other part of the residence.

5  Q.  Did you overhear what they were -- what questions they

6  were being asked?

7  A.  I could not.

8  Q.  Were you speaking real loud that people throughout the

9  house would hear you?

10  A.  I don't recall myself speaking in a tone that could have

11  been heard in another room.

12  Q.  Now, did Ms. Giovanni indicate to you that she needed her

13  cell phone for her business?

14  A.  She did.

15  Q.  Okay.  And did you make efforts to get that mirrored or

16  copied and return that to her as soon as you could?

17  A.  Yes.  As soon as we cleared up from the search, I took

18  possession of that item.  I drove all the way to the Manassas

19  RA, which we went in after hours.  We conducted a Cellebrite

20  examination of that phone, got that phone downloaded.  It was

21  late at night, so we returned to the hotel for the evening.

22  And then very early the next morning, about I'd say 10:00 or

23  so, we returned to Ms. Giovanni's residence and returned the

24  phone to her.

25  Q.  Okay.  At any time did Ms. Giovanni indicate to you that

1  she didn't understand your statement that she's free to leave

2  at any time she wanted?

3  A.  No.

4  Q.  Did you have any discussion with that, about her ability

5  not to answer questions, free to leave?

6  A.  It was a noncustodial interview, and she was free to

7  leave at any point.  She could answer any questions she

8  wanted that I asked her, she could refuse to answer any

9  questions, or not answer any questions at all.

10  Q.  You told her that?

11  A.  Yes, sir.

12      MR. KUNZ:  I have no further questions of Agent

13  Borghini, sir.

14      THE COURT:  Cross-examine?

15      MR. FOSTER:  Thank you.

16                      CROSS-EXAMINATION

17  BY MR. FOSTER:

18  Q.  Sir, I understand that you took physical possession or

19  custody of Ms. Giovanni after the house was cleared?

20  A.  I didn't take possession of her, no.

21  Q.  Okay.  Well, did you escort her into the house at some

22  point in time?

23  A.  All people who were outside were accompanied back into

24  the house, yes.

25  Q.  Listen to my question.  Did you escort her back into the

1    house at some time?  I didn't mean that disrespectfully.

2    A.   Yeah, what I'm trying to --

3    Q.   I'm just trying to see what you did, is what I'm trying

4    to do.

5         Did you take her from outside of the house inside the

6    house?

7    A.   And what I'm trying to explain, Mr. Foster, is a group of

8    us were told we could go back in the house.  At which point

9    we moved back into the house.  It's a narrow stairway, and so

10   forth.  So physically take her and bring her into the house,

11   no.  A group of us moved into the house.  At which point we

12   separated out.

13   Q.   Okay.  And that's after the house was cleared?

14   A.   Yes, sir.

15   Q.   And you've been in the courtroom, and Agent Brooks

16   testified that it took 15 -- I don't know if he said 15 to

17   20, but -- at least 15 minutes to clear the house.  Do you

18   recall that?

19   A.   I would say that's a good estimate.  I think it's about

20   15 minutes, and then about 20 minutes or 30 -- in that

21   particular area, we started being able to move back in.

22   Q.   Actually, he testified 15 to 20 minutes.  Do you recall

23   that?

24   A.   Did I or Mr. Brooks?

25   Q.   Sorry?

1   A.   Did myself or Mr. Brooks --

2          THE COURT:   It doesn't matter what he remembers the

3   other testimony is.   Just ask him what he remembers.

4   BY MR. FOSTER:

5   Q.   Do you remember it took about 15 or 20 minutes to clear

6   the house?

7   A.   Yes, sir.   And then they started setting up, and they

8   allowed us to go back in the house.

9   Q.   Did you see Ms. Giovanni when she was taken from the

10  house after the initial -- after the door was broken down?

11  A.   I was a ways back in the alleyway.   I could see what was

12  going on.   There were agents.   They had a protocol.   I stayed

13  out of their way.   Eventually, she was brought back to an

14  area and then brought back to where we were.

15  Q.   Okay.   When she was brought back to the area, was she

16  handcuffed behind her back?

17  A.   She was.

18  Q.   And when you initially saw her, did she have shoes on?

19  A.   I recall her having some type of black shoe on when I

20  initially saw her.

21  Q.   Well, was that -- were the shoes brought to her after the

22  house was cleared or was the shoes brought to her while the

23  house was being cleared?

24  A.   It was while the house was being cleared.

25  Q.   So who went inside to get the shoes for her while the

1    house was being cleared?

2    A.  I can't answer that question.

3    Q.  Does that make sense to you that you have agents, armed

4    agents, going through the house looking for potential

5    threats, and somebody is interrupting their clearing function

6    going in looking for shoes?  Does that make sense to you?

7    A.  Absolutely.

8    Q.  It does?

9    A.  Yes.

10   Q.  Okay.  Is that part of the operation plan that she would

11   be held outside while the house was being cleared?

12   A.  I don't know, but it's standard protocol.  You don't

13   leave people in the house that's uncleared and so forth.  You

14   are going to bring them back to a staging area or a holding

15   area until the situation is sorted out.  Once that's done,

16   then you can start making decisions on how to move forward,

17   so --

18   Q.  Did you review the operational plan in preparation for

19   your testimony here today?

20   A.  No.

21   Q.  Yes or no?

22   A.  I did not today.  I've reviewed it in the past as far as

23   a participant, but I did not review it for today, no.

24   Q.  I'm having trouble hearing sometimes in the courtroom.

25   That's why I'm --

1    A.   Yeah.

2    Q.   Did the operational plan to your recollection say

3    anything about she is going to be kept outside until the

4    house was cleared?

5    A.   I don't recall.

6    Q.   Who drafted the plan?

7    A.   It's typically something done by the office who's

8    executing the plan.  The operational plan is described as who

9    the participants are, who, what, where, and when.  It has

10   contingencies.  It has briefing stuff, such as the use of

11   deadly force, and so forth, nearest hospital.  It's standard

12   protocol that the office uses, and management reviews it and

13   signs off on it to move forward.

14   Q.   Maybe my questioning is not great, but I asked you who

15   prepared it, if you know.

16   A.   I do not know.

17   Q.   Did you review it before the time of the search warrant?

18   A.   Yes.

19   Q.   Do you recall anything in there about what was going to

20   be done with her while the search -- while the house was

21   being cleared?

22   A.   I don't recall.  I didn't have that assignment.

23   Q.   When you first encountered her, was she handcuffed?

24   A.   Yes.

25   Q.   Had she been searched?

1   A.  I assumed she had, because she had been passed back by

2   several agents.

3   Q.  Were there female agents present?

4   A.  Yes.

5   Q.  So she had been searched, and she was dressed as you say,

6   but she remained handcuffed behind her back?

7   A.  Until the team said the house was clear, everybody

8   remained handcuffed that were in handcuffs.

9   Q.  Including her?

10  A.  Yes, sir.

11  Q.  So, if it took 15 to 20 minutes to clear the house, how

12  long was the first part before the house clearing -- that is,

13  the knock, the break, and bringing the people down?  How long

14  would you estimate that took?

15  A.  I placed the phone calls.  We didn't have any.  That was

16  conveyed.  That became a relatively quick evolution.  And

17  then people started coming out.  So less than five minutes

18  before she was brought back there.

19  Q.  Do you recall her being placed in the back of a car?

20  A.  I don't recall that or I didn't see that.

21  Q.  Do you recall that it was cold outside?

22  A.  Cold is relative.  It was -- people were, you know, who

23  had showed up were dressed in various things.  I would say it

24  was probably about 40 degrees, is what I remember being that

25  day.

*Lawrence Borghini - Cross*

1    Q.  Were you wearing a coat?

2    A.  I'm not sure if I was wearing a coat.  I had a sweatshirt

3    or maybe a heavier garment on.  It might have been a light

4    jacket.

5    Q.  When you said that several people had passed Ms. Giovanni

6    back to you, do you mean that she was handcuffed and agent

7    number one passed her to agent number two, who then down the

8    line she eventually was passed to you?

9    A.  The stairways -- the door and the stairways were kind of

10   obscured.  There was agents in there.  It's a rather steep

11   incline going up there.  I'm sure somebody would have made

12   sure that she was not going to trip and fall, especially

13   somebody handcuffed behind their back and they're coming down

14   stairs, you're going to make sure you have control of the

15   person to get them safely from one point to another.

16   Q.  So it's a precarious situation for somebody who's

17   handcuffed behind their back to be taken down the stairs and

18   to be walked along, correct?

19   A.  I mean, it depends on the person.  If someone can walk on

20   their own in that condition, then, you know, agents aren't

21   going to be assisting as much as somebody who's, you know,

22   might need a little bit more help.  Is that what you're

23   trying to --

24   Q.  Well, you know, balance is an issue when you're --

25   A.  Right.

1    Q.   -- behind your back, if you've never been in that

2    situation before, you know, you have an increased risk for

3    falling.  Would you agree?

4    A.   Yes, sir.

5    Q.   Isn't it also very intimidating to be handcuffed behind

6    one's back?

7    A.   I would say intimidating, and then they are vulnerable as

8    well.

9    Q.   Okay.  And it's a control device that, when the FBI put

10   her handcuffs on her behind, that was to gain complete

11   control over her, correct?

12   A.   It's a safety issue.

13   Q.   But it's also a control issue, correct?  You gain control

14   for your safety?

15   A.   As far as I'm concerned, it's a safety issue.

16   Q.   Okay.  But separate from -- it's also control, you were

17   in complete control.  She was handcuffed behind her back; she

18   wasn't going to be able to do much in that situation,

19   correct?

20   A.   Correct.

21   Q.   Was there any discussion as to whether we should handcuff

22   her behind or handcuff her in front?

23   A.   No.

24   Q.   Now, would you agree with me that up until the time that

25   she's brought back into the house that there were -- there

1    were significant restrictions placed upon her movement?

2    A.   Yes.  When she was in a set of handcuffs and waiting for

3    the house to be cleared, at that point she was put in a safe

4    location around people, you know, to make sure nothing

5    happened to her.

6    Q.   The amount of restrictions that were imposed upon her at

7    that point is pretty much the same restrictions that you put

8    upon somebody when you arrest them, correct?

9    A.   Typically, at the time of an arrest you inform that

10   person you're under arrest, so --

11   Q.   I understand that.  But when you arrest somebody, you

12   handcuff --

13   A.   If you're asking procedurally, yes, it's the same; but,

14   however, there are two different circumstances.

15   Q.   Understood.  But the custody of the person is maintained

16   by handcuffing them behind their back, right?

17   A.   Yes.

18   Q.   You don't -- do you remember anything about her being

19   placed in the back of a car?

20   A.   I didn't see it, and I don't recall it.

21   Q.   She was never advised of her *Miranda* rights, was she?

22   A.   She was not.

23   Q.   Was not.  Was that your decision?

24   A.   Yes.

25   Q.   Okay.  Was it your decision to give Mr. Shallal his

1    *Garrity* rights?

2    A.   No.

3    Q.   So another agent decided, I assume -- correct me if I'm

4    wrong -- somebody else in the FBI decided he should get

5    *Garrity*, but that Ms. Giovanni -- but you decided not to give

6    them to her, correct?

7    A.   That's correct.

8    Q.   She was the focus of the investigation, right?

9    A.   Yes, sir.

10   Q.   You had planned this interview to occur, had you not?

11   A.   I had prepared, if she wanted to give a statement, I was

12   willing to sit down with her and talk to her, yes.

13   Q.   And the FBI had surveilled her home for a couple of weeks

14   before looking to make sure that she'd be there when you

15   served the search warrant, right?

16   A.   They did some surveillance -- yes, they did some spot

17   checks of the residence, but --

18   Q.   Was that at your direction?

19   A.   Yes.

20   Q.   So you had asked the FBI in Virginia to do surveillance

21   to try to make sure that she would be present, correct?

22   A.   I asked them to spot check the residence to see if

23   Ms. Giovanni could be located at that residence.

24   Q.   By "spot check," you mean go by, drive by or sit there

25   for a while and see if you can --

1   A.   Right, to drive by the residence.  If there's activity or

2   vehicle that's known to be associated with Ms. Giovanni,

3   then report back.

4   Q.   Did you confer with anybody at the United States

5   Attorney's Office about your decision not to advise her of

6   her *Miranda* rights?

7   A.   I don't recall.  It would have been a noncustodial

8   interview.

9   Q.   Not my question, sir, and I apologize.  Mr. Kunz can ask

10  you whatever is necessary on redirect.

11      My question was simply this:  Did you confer with anybody

12  in the United States Attorney's Office about the decision not

13  to advise her of her *Miranda* rights?

14  A.   I don't have a specific recollection; but, however, I

15  probably would have -- I probably would have reached out to

16  Mr. Kunz or somebody to ask about that.

17  Q.   So you're saying that you probably discussed with

18  Mr. Kunz the decision not to advise her of her *Miranda* rights

19  on this occasion?

20  A.   I'm trying to be honest.  I don't have a specific

21  recollection; however, it probably would have been my

22  practice that I would have done that.

23  Q.   Was there anything written back and forth between you and

24  Mr. Kunz or anybody else concerning how to go about the

25  interview without advising of rights?

1    A.   No.

2    Q.   Any emails back and forth?

3    A.   No.

4    Q.   Any phone conversations that you recall?

5    A.   Once again, it was conducted up in the Northern District.

6    I can't remember if I had discussed with Mr. Kunz prior to

7    traveling up there, or I was up there and I had a

8    conversation.

9    Q.   Was there anything in the operational plan about that the

10   interview was going to occur with her without advice of

11   *Miranda*?

12   A.   I don't recall anything, no.

13   Q.   You could have easily have advised her of her *Miranda*

14   rights, correct?

15   A.   It's not our protocol.  It was a noncustodial interview.

16   Q.   Well, listen to my question.  You could have easily

17   advised her of her *Miranda* rights, correct?  If you wanted

18   to, you could have done it, right?

19   A.   If it was appropriate.  Once again --

20   Q.   It's up to the Judge to decide whether or not it was

21   required.  I'm just asking, if you wanted to, you have forms

22   you could have presented her with *Miranda* rights, right?

23   A.   Right, we have FD-395, Advice of Rights forms.

24   Q.   You've probably done that over a hundred times?

25   A.   I've done it a lot.

1  Q.  Yeah.  But on this occasion you decided not to?

2  A.  No.  The FBI has a protocol when we -- when we use Advice

3  of Rights, when we don't use Advice of Rights.  This was a

4  noncustodial interview.

5  Q.  Okay.  Where is the protocol that defines what a

6  noncustodial interview is?  Can you share that with us?

7  A.  It's when somebody is making a voluntary statement.

8  Q.  So even if they're handcuffed and in custody, if they are

9  making a voluntary statement, *Miranda* rights are not

10 required?

11 A.  Ms. Giovanni was not in handcuffs.

12 Q.  Listen to my question.  You said that --

13      THE COURT:  We're not making a lot of progress here.

14 I'm going to decide what the law is, so --

15      MR. FOSTER:  Understood.  I'll move on, sir.

16      THE COURT:  Let's figure out what the facts are, and

17 we'll talk about the law later.

18      MR. FOSTER:  All right, sir.

19 BY MR. FOSTER:

20 Q.  Did you take Ms. Giovanni's phone?

21 A.  No, not initially.  It was recovered during the search.

22 Q.  And did the FBI maintain custody of that phone during the

23 time of the search warrant?

24 A.  Yes.

25 Q.  Okay.  Did you take her car keys?

 1  A.   No.

 2  Q.   Were her car keys taken by anyone?

 3  A.   I don't know.  I can't answer that question.

 4  Q.   Did you take her computer?

 5  A.   Her computer was seized, yes.

 6  Q.   Did you attempt to shut off the cameras in the house?

 7  A.   Once again, the local team that was securing the

 8  location, we had people -- we had CART people and so forth

 9  that made entry.  Typically, what happens in those type of

10  situations, they go through and make an assessment.  And

11  based on what they are going to seize and so forth, and

12  what's hooked to what, they --

13  Q.   Do you remember my question?

14  A.   Did I shut the cameras off?  No.

15  Q.   Are you aware of anybody shutting off the cameras or

16  trying to?

17  A.   There was a security system in the house.  There was a

18  team that evaluated that.  What they did, whether they shut

19  everything down and so forth --

20  Q.   Do you remember opening the windows in the room where she

21  was seated?

22  A.   No.

23  Q.   Do you remember calling her a pathological liar?

24  A.   No.

25  Q.   Did you think she was a pathological liar?

1  A.  I don't recall calling her a pathological liar.

2  Ms. Giovanni, in my opinion, does have problems with the

3  truth.

4  Q.  Do you remember her asking for a space heater because she

5  was cold?

6  A.  No.

7  Q.  Do you remember her asking for some warm clothes?

8  A.  I think she -- I can't remember if she -- I think she did

9  get a jacket or she was allowed to get a jacket, yes.

10  Q.  Do you remember her presenting a card to you regarding

11  advice of rights?

12  A.  No.

13       MR. FOSTER:  I have already marked this as Number 8,

14  but I'm going to mark this second one as Number 8.  I have

15  given a copy to Mr. Kunz.

16       THE COURT:  I think you had an 8 already.

17       MR. FOSTER:  Right, but I can't find it, if it's

18  okay.

19       THE COURT:  Why don't you mark it 9, so we only have

20  one 8.  Zero or one 8 is okay.  Two 8s is not.  So we will

21  make this Defense 9.

22       MR. FOSTER:  May I approach, Your Honor?

23       THE COURT:  You may.

24  BY MR. FOSTER:

25  Q.  Let me show you what has been marked as Number 9.  Do you

1  recognize that?

2  A.  I do not, but I can tell you what the picture is of.

3  Q.  What is it of?

4  A.  It looks like it's the contents of a purse that's been

5  spread out and put on one of the couches in the other room.

6  Q.  Do you remember collecting the items from Ms. Giovanni's

7  purse?

8  A.  No.  I didn't do any collection that day.

9  Q.  Do you have the contents of her purse in the evidence

10  locker for the FBI today?

11  A.  Yes, but that was seized at the time of her arrest.

12  Q.  So you received it at some point, right?

13  A.  The contents of her purse were seized in December of

14  2017.

15  Q.  January?  The item which is in front of you, was this

16  taken on the day of the search warrant?

17  A.  This was, yes.

18  Q.  That's from her purse, isn't it?

19  A.  That is a picture of what was in her purse.

20  Q.  Okay.  Let me approach you now with 10.

21       MR. FOSTER:  Judge, I would like to offer this into

22  evidence please.  It's Defendant's 9.

23       THE COURT:  Defense 9 is admitted.

24    (DEFENSE EXHIBIT NO. 9:  Received in evidence.)

25       MR. FOSTER:  Which Mr. Kunz has.

```
 1   BY MR. FOSTER:

 2   Q.  Let me show you 10.  Do you recognize 10?

 3   A.  No.  That's the first time I'm seeing this.

 4   Q.  That's the first time you've seen it?

 5   A.  Yes.

 6   Q.  Do you recall -- so you don't recall Ms. Giovanni

 7   producing a card that on the flip side was from a lawyer

 8   where it says, "I want to speak to an attorney"?

 9   A.  She never did that during the time I spoke with her.

10   Q.  Do you remember ever seeing that card?

11   A.  No.

12   Q.  Do you have that card now?

13   A.  I don't know.

14   Q.  Do you remember Ms. Giovanni saying she wanted to talk to

15   a lawyer?

16   A.  Yes.

17   Q.  She said that more than once, though, didn't she?

18   A.  No.

19   Q.  How early in the course of the events did you take her

20   cell phone?

21   A.  I never took it.  It was upstairs.

22   Q.  Fair to say --

23   A.  They were conducting a search.  It was left in place

24   until it was officially collected, so --

25   Q.  So the cell phone was upstairs in her bedroom?
```

1    A.   I don't know where they found it.

2    Q.   Somewhere upstairs?

3    A.   Correct.

4    Q.   And immediately upon the entry to the house, she was

5    downstairs, right?

6    A.   I wasn't inside, so -- it's fairly -- yes, fair to say.

7    Q.   She never had access to her own cell phone at least

8    during the course of this day, January 11, 2017, right?

9    A.   Correct.

10   Q.   So she had no way on her own to communicate with her

11   lawyer, correct?

12   A.   She did have means.

13   Q.   Through her own cell phone?

14   A.   No.

15   Q.   You testified that at some point later on you allowed her

16   to use your cell phone to call the attorney.

17   A.   When she indicated she wanted to speak to her attorney.

18   Q.   Do you deny that at any time prior to that she had

19   mentioned to you that she wanted to speak to an attorney?

20   A.   Yes.

21   Q.   Did you do a log, like an interview with her, like we

22   started the interview at this time, and at this time she

23   asked to go to the bathroom, and at this time we ended?  Did

24   you do that?

25   A.   I keep rough notes of my interviews, and then I

1    transcribe them.

2    Q.  Do you still have them?

3    A.  Yes.

4         MR. FOSTER:  May we ask that they be produced, sir?

5         THE COURT:  I think the law is that rough notes don't

6    get turned over.  302s do for a testifying witness.

7         MR. KUNZ:  That's correct.

8    BY MR. FOSTER:

9    Q.  Do your notes contain a timeline, like took custody of

10   her at 9:20, she asked to go to the bathroom at 9:40, I let

11   her use the phone at 9:50?  Do your notes contain that?

12   A.  My notes contained Ms. Giovanni's responses to answers,

13   and then I -- I don't know if I put the time, but I indicate

14   she was given a -- she wanted a break and stuff like that.

15   And then the time she did say she wanted to speak with her

16   attorney, I can't remember if I noted that, or it was the

17   time that was on my phone that I noted and terminated the

18   interview at that point.

19   Q.  Are you trained to keep interview logs when you're

20   interviewing suspects?

21   A.  Trained to keep rough notes, yes.

22   Q.  No, no.  Are you trained to keep a log like a time log,

23   began interview at this time, ended the interview, and to

24   discuss the intervening events?

25   A.  I don't keep separate documents.  I keep one

1  contemporaneous document.

2  Q.  So to the best of your recollection, you don't have

3  anything that sets out the different times of the different

4  events?

5  A.  I didn't review my notes preparing for this, so --

6  typically, what's in my notes is what's on that 302.

7  Q.  Okay.  Did you ever raise your voice with Ms. Giovanni?

8  A.  No.

9  Q.  So was your voice with Ms. Giovanni essentially the level

10  of voice that we're exchanging right now?

11  A.  It was conversational.

12  Q.  So you're saying at no point did you raise your voice to

13  her?

14  A.  I did not yell at Ms. Giovanni.

15  Q.  I didn't ask if you yelled.

16  A.  I'm trying to -- my level of conversation matched what

17  Ms. Giovanni's level of conversation was.

18  Q.  So, when she raised her voice, you raised your voice?

19  A.  No.  I didn't match exactly, but when she was insistent

20  on seeing the Shallal brothers, I told her, no, you could not

21  go, they were talking to the agents.

22  Q.  So you kept her separate from the Shallal brothers?

23  A.  No.  They were talking to other agents.

24  Q.  Listen to my question.  You kept her separated -- I

25  didn't mean that bad, but -- you kept her separated from the

1    Shallal brothers?

2    A.   No.  The Shallal brothers did not want to talk to her.

3    Q.   You just said that she asked to see the Shallal -- talk

4    to the Shallal brothers, but they were being interviewed by

5    other agents.

6    A.   Correct.

7    Q.   So you did not allow her to go speak to the Shallal

8    brothers, correct?

9    A.   She was not going to interrupt them, no.

10   Q.   So she was kept separate from the Shallal brothers?

11   A.   They were being interviewed in a different location.

12   Q.   So she was kept separate from the Shallal brothers?

13   A.   Yes.

14   Q.   She asked to see the Shallal brothers, but she was told

15   you're going to be kept separate from them; is that correct?

16   A.   No.  She was told she was not going to go interrupt them

17   giving their statements.

18   Q.   Mr. Kunz had the form, the diagram on the Shallal

19   brothers on the overhead.  I think it's marked

20   Government's 1.  Which room -- this is my copy of one.  Which

21   room did you have her in?  You had her in Room E?

22   A.   Right here.

23   Q.   Okay.  Was she in Room E the whole time?

24   A.   No.  While we were being interviewed, between 7:30 and

25   9:30, but there were breaks.  I recall her being allowed to

1    come out and get some coffee, some food.  She used the

2    restroom, she was allowed smoke breaks.

3    Q.  When she used the restroom, did an agent go with her to

4    the restroom?

5    A.  Standard practice is --

6    Q.  I didn't ask you what the standard practice is.

7    Respectfully, listen to my question.  When she used the

8    bathroom, did an agent go with her to the bathroom?

9    A.  I believe a female agent was in the area, yes.

10   Q.  Did the female agent go inside the bathroom or insist

11   that she keep the door open when she went to the bathroom?

12   A.  I didn't get involved in that process.

13   Q.  Is that standard practice, that that's the way it works?

14   A.  Typically.

15   Q.  Okay.  So, if she wanted to use the commode, for example,

16   the agent would be standing there or have the door open so

17   she could keep eyes on Ms. Giovanni?

18   A.  Correct.

19   Q.  When she wanted to take a smoke break, did somebody

20   accompany her, I presume, outside?

21   A.  Yes.

22   Q.  Who was in Room E with you interviewing Ms. Giovanni?

23   A.  Mr. Pekerol.

24   Q.  Just the two of you?

25   A.  Yes, sir.

1    Q.  Did you have an FBI jacket on?

2    A.  No.

3    Q.  Okay.  Were you armed?

4    A.  Yes.

5    Q.  Was your firearm visible?

6    A.  I don't recall if I was wearing a firearm on my hip or a

7    firearm on my ankle that day, but I did have a light jacket

8    on, and I typically wear something that covers my firearm.

9    Q.  But do you recall whether you --

10   A.  I can't remember that day.

11   Q.  Was Agent Pekerol armed?

12   A.  I'm sure he was, yes.

13   Q.  Was his weapon visible?

14   A.  No.  He was actually in a shirt and tie that day.

15   Q.  Was he armed?

16   A.  Yes, he was.

17   Q.  Did he have a jacket on, and his gun was underneath the

18   jacket?

19   A.  I would assume --

20   Q.  Is that your testimony?  Yes?

21   A.  I believe so; yes, sir.

22   Q.  Other than the FBI and the IRS, what other agencies were

23   represented at this search?

24   A.  We had the FBI there, IRS, SIGAR.

25   Q.  SIGAR?

```
 1   A.  Correct.

 2   Q.  What is that?

 3   A.  That's the investigative or special investigative general

 4   for --

 5   Q.  Special investigative -- like military police?

 6   A.  For Afghan -- no.  It's an IG.

 7   Q.  It's an IG, Inspector General?

 8   A.  Yes, sir.

 9   Q.  Are they agents?

10   A.  Yes.

11   Q.  Are they armed?

12   A.  Yes.

13   Q.  How many people were there from SIGAR?

14   A.  One.

15   Q.  Did that agent have access to Ms. Giovanni?

16   A.  No.  He's part of the search.

17   Q.  What other agencies were there?

18   A.  Department of State, IG.

19   Q.  Special agent?

20   A.  Yes.

21   Q.  How many total agents were in and out of the house that

22   day?

23   A.  I can't tell you, sir.  There should be a log.

24   Q.  Who has it?

25   A.  I'm not sure.  There's documents that document the search
```

1    and --

2    Q.  Okay.

3         MR. FOSTER:  May I have a moment, sir?

4         THE COURT:  You may.

5    BY MR. FOSTER:

6    Q.  Just a little bit of follow-up, sir.

7        Did the agents search all of the rooms in the house?

8    A.  I can't answer that question, but I would assume so.

9    Q.  Was the house under the control of law enforcement during

10   the time -- was the house under the control of law

11   enforcement until after the search terminated?

12   A.  Yes.

13   Q.  Yes?

14   A.  Yes.

15   Q.  Do you recall the thermostat ever being turned down?

16   A.  No.

17   Q.  Who took Ms. Giovanni's cuffs off?

18   A.  I can't remember.  I could've done it myself.

19        MR. FOSTER:  One moment.

20        That's all I have.  Thank you.

21        THE COURT:  Cross-examine?  Oh --

22        MR. KUNZ:  Redirect.

23                    REDIRECT EXAMINATION

24   BY MR. KUNZ:

25   Q.  Agent Borghini, counsel had asked you a number of

1  questions about not giving a *Miranda* form to Ms. Giovanni.

2  In all of the years you have been in the FBI, do you use it

3  for voluntary interviews?

4  A.   No.

5  Q.   And when you went there on January 11th, did you intend

6  to place her in custody for anything?

7           MR. FOSTER:  Judge --

8           THE COURT:  Really, with all due respect to

9  Mr. Borghini, I'm not going to tell him how to arrest people

10 out on the street, and I don't really care what he says the

11 law is.  That's going to be my decision.  So, if it's their

12 standard practice to violate *Miranda*, it doesn't make it any

13 better.

14          MR. KUNZ:  I have nothing further.

15          THE COURT:  You told Ms. Giovanni she was free to

16 leave.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  How many times?

19          THE WITNESS:  At least two or three, sir.

20          THE COURT:  When?

21          THE WITNESS:  Before I started talking to her and

22 asking her questions.

23          THE COURT:  Well, two or three times in a row?  I'm

24 wondering how it comes up two or three times.

25          THE WITNESS:  When we started explaining to her what

1  the situation was and how there was going to be a search, it

2  would have been, "Ms. Giovanni, we're here to execute a search

3  warrant; you're not under arrest, you're free to leave if you

4  wish."  So that would have been one time.

5          THE COURT:  Are you the one that did that?

6          THE WITNESS:  Yes, I think at that point --

7          THE COURT:  They've cleared the house, you come in

8  and you tell them?

9          THE WITNESS:  I start talking to Ms. Giovanni,

10  because it's her residence, to explain to her what's going on.

11          THE COURT:  Are you already over in the room with her

12  in the chair?

13          THE WITNESS:  No, sir.  I think we're standing up

14  getting ready to -- because at that point I'm wanting to

15  determine what she's wanting to do, if she is wanting to stay

16  or if she's wanting to leave.

17          THE COURT:  Is this after -- she's already been

18  outside and come back in?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  So soon after she comes back in, you're

21  making the announcement.

22          THE WITNESS:  She's wanting to know what's going on,

23  and I explained to her what's going on.

24          THE COURT:  And are the Shallals there?

25          THE WITNESS:  No.  At this point I think they had

1   gone into separate rooms, and they were talking to agents, and

2   they were explained what was going on.

3         THE COURT:  So the search warrant, we're going to

4   search, you can leave if you want?

5         THE WITNESS:  Yes, sir.

6         THE COURT:  Does she have her handcuffs on at that

7   point?

8         THE WITNESS:  No, sir.

9         THE COURT:  All right.  So that's once.

10         THE WITNESS:  Then after I explained that to her,

11   then once again I asked her, I said, "We would like to go

12   ahead and talk with you, and talk to you about a certain

13   subject matter with Colby Miller and so forth," and determine

14   if she wants to make a statement.  Once again I go through my

15   standard practice, you know, this would be a voluntary

16   statement, you are free to leave.

17         THE COURT:  Is she still at the front or is she back

18   in the room?

19         THE WITNESS:  Do you have the diagram, sir?

20         THE COURT:  No, but I --

21         THE WITNESS:  She's not in the chair, but she's not

22   in the front of the house or anything like that.  We are

23   probably in the living room area standing up.

24         THE COURT:  And the living room area is the area with

25   the chair that she wound up sitting down in?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Got it.  Okay.  So you're back in that

3    room.

4          THE WITNESS:  Right.  So I'm trying to determine at

5    that point, once I've explained to her that we have a search

6    warrant, we're going to search the house, and then I'm trying

7    to determine if she's wanting to sit down and make a statement

8    with us.

9          THE COURT:  And she says yes?

10          THE WITNESS:  At that point she's willing to talk.

11    As we sit down, once again, I go over everything, once she

12    gets in the chair, you know, explain to her, you know, I'm

13    going to ask you some questions; I may have some documents to

14    show you; you can answer my questions; you cannot answer the

15    questions; and at any time you're free to leave.  And then

16    she, you know, wanted to start answering questions, and we

17    started talking about stuff.

18          THE COURT:  Mr. Foster had asked you a question, I

19    think you told him that you had planned to execute the search

20    warrant at a time when she was home.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  I take it you hoped she'd be there and

23    you hoped that she would be willing to talk to you.

24          THE WITNESS:  That would have been her choice, but

25    yes.

1        THE COURT:  I understand.  But you wanted to give her

2   the opportunity to talk to you if she was willing to do it.

3        THE WITNESS:  Yes, sir.

4        THE COURT:  It's good for you if she'll talk to you.

5        THE WITNESS:  Correct.

6        THE COURT:  There was some jockeying about how many

7   agents.  We don't need an exact number.  Twenty is in the

8   ballpark?

9        THE WITNESS:  Yes, sir.

10        THE COURT:  Questions just to follow up on mine, and

11   I promise never to rule based on who says the same thing most

12   times; but, if there is something new, this is the

13   opportunity.

14        MR. KUNZ:  I have nothing, sir.

15        MR. FOSTER:  I do.  I don't know what our next number

16   is?  Ten?

17        DEPUTY CLERK:  Eleven.

18                    RECROSS-EXAMINATION

19   BY MR. FOSTER:

20   Q.  Let me show you what's marked as Number 11.  Do you

21   recognize Number 11?

22   A.  I do.

23   Q.  Is that the 302 report you wrote of the events on

24   January 11, 2017?

25   A.  Yes.

1  Q.  Okay.  There is nothing in this report, is there, about

2  multiple times telling her, "You're free to leave and you

3  don't have to answer any questions," is there?

4  A.  If I can look at the 302 one more time.

5  Q.  You can.  And I'll give it back to you in just a second.

6  It says here, "At the outset of the interview, Borghini

7  explained to Giovanni that the agents were there to execute a

8  search warrant; that she was not under arrest; that she was

9  free to leave; and that she was not obligated to answer any

10  questions.  She said she understood and provided the

11  following."  Did I read that correctly?

12  A.  You're going to have to give me a better copy than what

13  is on there.

14  Q.  I'm going to give you the original.

15          MR. FOSTER:  Judge, can you see that?

16          THE COURT:  I can see it, but I'm looking at a bigger

17  screen than Mr. Borghini is so --

18          MR. FOSTER:  Yes.

19          THE COURT:  I can let him look at what I --

20          MR. FOSTER:  I understand.

21          THE COURT:  This is a hard copy, I'm sure not an

22  original.

23          MR. FOSTER:  I understand what you said about the

24  technology.

25          THE WITNESS:  Okay.

BY MR. FOSTER:

Q.  Can you show us anywhere else in the 302 -- let me back up.

So, according to your 302, at the onset, at the beginning before you asked her any questions, that's when you gave her that -- that's when you made that statement to her, correct?

A.  Yes.  What you're talking about is my --

Q.  The introductory paragraph?

A.  -- my introductory paragraph.  That doesn't record verbatim every word I had between the start until the time we sat down.

Q.  Well, you testified earlier that you keep rough notes and essentially everything on the rough notes makes its way into the 302, correct?

A.  Yes, sir.

Q.  Can you show me anywhere else in that 302 when you tell her, you don't have to answer any questions and you're free to go?

A.  No.  I have it recorded one time.

Q.  You have it recorded on time.  So other than your testimony here that you told her that two or three times, there is nothing in your report that confirms that, is there?

A.  That's correct.

Q.  What's the date in the upper-right-hand corner of when the report was entered?

1    A.   August 31st, 2017.

2    Q.   And when did the interview occur?

3    A.   January 11th, 2017.

4    Q.   So what does "entered" mean?

5    A.   There's three dates on this document.

6    Q.   Yes.

7    A.   The first date is when the investigation or the interview

8    was conducted.

9    Q.   Yup.

10   A.   Then there was the date which I drafted the document.

11   Q.   Yes.

12   A.   Which means I would have typed it out and so forth.  And

13   that's actually the date that it became an official record in

14   the case file.

15   Q.   So could you have amended the 302 any time up to

16   August 31, 2017, if that's the date, August of 2017, when

17   it's entered?

18   A.   Yes.  At that point, looking at the date I drafted it on,

19   if I had any edits and so forth.

20   Q.   So you never went back and added anything about

21   additional times that she was told she didn't have to answer

22   any questions?  I guess that's my point.

23   A.   No, sir.

24        MR. FOSTER:  That's all I have.  Thank you.

25        THE COURT:  Thank you, Mr. Borghini.  You may step

1    down and return to counsel table.

2                        *   *   *   *   *   *   *   *   *

3              THE COURT:  Mr. Kunz, please call your next witness.

4              MR. KUNZ:  Call Agent Borghini.  It will be very

5    short.

6         (**LAWRENCE BORGHINI**, having been previously duly sworn, was

7    recalled by the government.)

8              THE COURT:  Mr. Borghini, you may be seated.  You are

9    still under oath.

10             Mr. Kunz, you may proceed.

11                        DIRECT EXAMINATION

12   BY MR. KUNZ:

13   Q.  Mr. Borghini, as part of the investigation, were you able

14   to review the texts, any test messages issued by Ms. Giovanni

15   on her cell phone?

16             MS. SILVER:  Judge, I'm objecting.  This is outside

17   of the scope of the motion to suppress as to whether or not

18   she gave a voluntary statement, whether or not she waived

19   *Miranda*.

20             THE COURT:  Overruled.

21             THE WITNESS:  Yes, I did a Cellebrite examination on

22   her cell phone and I recovered text messages.

23   BY MR. KUNZ:

24   Q.  And did you specifically look at any text messages that

25   were sent by Ms. Giovanni or received by Ms. Giovanni during

1    a period of time that she was at that guesthouse in

2    Sulaymaniyah in Iraq, December 12, 2015, through December 15,

3    2015?

4    A.   There were text messages that I reviewed; yes, I did.

5    Q.   And with respect to those text messages, and rather than

6    introducing a whole slew of these text messages, let me just

7    ask you this:

8         Did it include any text messages where she told, for

9    example, Ken Cook on December 12, 2015, that she was being

10   held as a guest there in Iraq?

11   A.   That was one of the text messages, yes.

12   Q.   And she indicated that all of us were doing that, not to

13   be alarmed?

14   A.   Correct.

15   Q.   Was there some discussion with a Victor Premof who worked

16   with her concerning, you know, her being in an area that

17   Mr. Cook had recommended would be dangerous, and she

18   indicated that it was too late, we had already become guests

19   by that time?

20   A.   Yes.

21   Q.   Now, did you also at that same time frame determine

22   through the texts that she was trying to conduct various

23   business by talking to one of her employees and also trying

24   to transfer funds to somebody else that she wanted to provide

25   some money to?

1   A.   Yes.

2   Q.   And did she later indicate that in the same time frame

3   that she told individuals in the United States that she was

4   going to be moved, and that ultimately they were being moved

5   to -- from -- to Erbil from a PUK checkpoint?

6   A.   Yes.

7   Q.   And did she indicate that they wanted to be nice and drop

8   us off at our luggage at the checkpoint for PUK or KDP, and

9   that's where she was going to head through the first

10  checkpoint on Kirkuk Road?

11  A.   That's one of the text messages, yes.

12  Q.   Now, also, sir, in taking a look at that time period, did

13  you have an occasion to take a look at the cell phone log of

14  calls actually made by Ms. Giovanni during that same time

15  frame?

16  A.   There are call logs, not on the phone, but call logs.

17  Q.   And did you determine at that same time frame she made

18  quite a number of calls back and forth with individuals while

19  she was at this guesthouse?

20  A.   There's incoming phone calls and outgoing phone calls to

21  her number, and they were completed for a period of time,

22  which would lead somebody to believe there was a

23  conversation.

24          MR. KUNZ:   I have nothing further of Agent Borghini.

25          THE COURT:   Cross-examine?

1          MS. SILVER:  May I have a moment with Mr. Foster?

2                          CROSS-EXAMINATION

3    BY MS. SILVER:

4    Q.  Agent Borghini, you weren't there like Connelly was in

5    Iraq, right, at that time?

6    A.  No, I wasn't.

7    Q.  You would agree that, when she was detained by the Kurds,

8    she was there until the Kurds would let her go, right?

9    A.  I don't know the situation.  I mean, Mr. Connelly better

10   described it.  He would know better than I.

11   Q.  But he had no control over the release of her, right?

12   A.  That's correct.

13          MS. SILVER:  Okay.

14          THE COURT:  Redirect?

15          MR. KUNZ:  No, thank you.

16          THE COURT:  Thank you, Mr. Borghini.  You may step

17   down.

18     (End of excerpt.)

19                     *   *   *   *   *   *   *   *

20   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
21   redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
22   transcript.

23

24   *Judy A. Gagnon*                        *9/7/2018*
     Judy A. Gagnon, RMR, FCRR               Date
25   Official U.S. Court Reporter

1                              INDEX

2
   WITNESS FOR THE GOVERNMENT:                          PAGE
3

4    *LAWRENCE BORGHINI*
           DIRECT EXAMINATION BY MR. KUNZ................... 3
5          CROSS-EXAMINATION BY MR. FOSTER................. 14
           REDIRECT EXAMINATION BY MR. KUNZ................ 40
6
     *LAWRENCE BORGHINI-Recalled*
7          DIRECT EXAMINATION BY MR. KUNZ................... 43
           CROSS-EXAMINATION BY MR. FOSTER................. 55
8          REDIRECT EXAMINATION BY MR. KUNZ................ 79
           RECROSS-EXAMINATION BY MR. FOSTER............... 84
9
     *LAWRENCE BORGHINI-Recalled*
10         DIRECT EXAMINATION BY MR. KUNZ................... 88
           CROSS-EXAMINATION BY MS. SILVER................. 91
11

12                    *   *   *   *   *   *   *   *

13
                            DEFENSE EXHIBIT
14

15     NO.:              DESCRIPTION                      PAGE

16   9      Photo of contents of purse                    70

17

18                  *   *   *   *   *   *   *   *

19

20

21

22

23

24

25