**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY, FLORIDA**

```
UNITED STATES OF AMERICA,        )
                                 )
                  Plaintiff,     ) Case No:  5:17-cr-32/RH
                                 )
vs.                              ) Panama City, Florida
                                 ) May 16, 2018
AMANDA GIOVANNI, CLARK           )
ONSTAD, AND KENNETH COOK,        )
                                 )
                  Defendants.    )
_____)
```

**TESTIMONY OF MICHAEL CONNELLY**


**TRANSCRIPT OF \*\* EXCERPT \*\* OF MOTION HEARING**
**BEFORE THE HONORABLE ROBERT L. HINKLE,**
**UNITED STATES DISTRICT JUDGE**

APPEARANCES:

```
 For the Plaintiff,       Christoper P. Canova
 United States of         United States Attorney
 America:                 By:  STEPHEN M. KUNZ
                               Assistant U.S. Attorney
                               stephen.kunz@usdoj.gov
                          111 North Adams Street
                          Suite 400
                          Tallahassee, Florida   32301


 For the Defendant,       Todd Foster Law Group
 Amanda Giovanni:         By:  TODD A. FOSTER
                               MATTHIEU GODDENYE
                               NATALIA B. SILVER
                               Attorneys at Law
                               tfoster@tfosterlaw.com
                               mgoddeyne@tfosterlaw.com
                               nsilver@tfosterlaw.com
                          1881 West Kennedy Boulevard
                          Tampa, Florida 33606
```



***JUDY A. GAGNON, RMR, FCRR***
*Official United States Court Reporter*
*111 North Adams Street * Tallahassee, Florida  32301-7717*
*(850) 561-6822*

APPEARANCES:  Cont'd

```
For the Defendant,      Downing Law Offices
Clark Onstad:           By:  JEAN MARIE DOWNING
                             Attorney at Law
                               jdowning@pcbeachlaw.com
                        2612-B West 15th Street
                        Panama City, Florida   32401


For the Defendant,      Cassidy Law Firm
Kenneth Cook:           By:  THOMAS J. CASSIDY, III
                             Attorney at Law
                               cassidylawfirm@comcast.net
                        233 East Beach Drive
                        Panama City, Florida   32401
```

```
1                         *  *  *  *  *  *  *  *
2              THE COURT:  Please be seated.
3              Please raise your right hand.
4         MICHAEL CONNELLY, GOVERNMENT WITNESS, DULY SWORN
5              THE COURT:  Be seated.
6              Please, state your full name and spell your last
7    name.
8              THE WITNESS:  Michael Connelly, C-o-n-n-e-l-l-y.
9                         DIRECT EXAMINATION
10   BY MR. KUNZ:
11   Q.  Good afternoon, sir.
12   A.  Good afternoon.
13   Q.  By whom are you employed?
14   A.  I'm a special agent with the FBI.
15   Q.  And how long have you been with the FBI?
16   A.  A little over 18 and a half years.
17   Q.  Have you had any assignment with the FBI outside of the
18   United States?
19   A.  Several.
20   Q.  And let's direct your attention back to the 2015 time
21   frame.
22   A.  Yes, sir.
23   Q.  Where were you assigned at that point, sir?
24   A.  Erbil, Iraq.
25   Q.  And in what capacity was that?
```

 1   A.   I was the assistant legal attaché at the U.S. Consulate

 2   in Erbil.

 3   Q.   And is that in the Kurdistan area of Iraq?

 4   A.   Yes, sir.

 5   Q.   Let me ask you, to zero right in.  At this time, on

 6   December -- I'm going to ask you about December 14, 2015.  At

 7   that particular time period what was the situation that you

 8   observed with respect to the safety and the state of things

 9   in the Kurdistan area?

10   A.   It was a really tense period of time.  A few months

11   before that, the ISIL had actually a standing army at that

12   point in time and it invaded the country.  A vehicle-borne

13   improvised explosive device had been detonated at the U.S.

14   Consulate a few months before this time.  There were some

15   attempted suicide bombings.  So there was a hyper-security

16   posture there, because it was really a nation that was at

17   war.

18   Q.   Okay.  And based on that, were there concerns for

19   American citizens coming in or going out of that area?

20   A.   Extensive concern.

21   Q.   And as part of your duties as a Legat, did you

22   communicate with the local law enforcement in Iraq to

23   indicate that -- or did they communicate with you that they

24   wanted to make sure all visitors were protected?

25   A.   Constantly.

1    Q.   Now, on December 14, 2015, did you have occasion to

2    travel to any place from Erbil where the consulate was?

3    A.   Yes, sir.

4    Q.   Where did you go to?

5    A.   Sulaymaniyah, Iraq.

6    Q.   How far away is that from Erbil?

7    A.   About a four-hour drive when you're moving in a secured

8    convoy, east of Erbil.

9    Q.   Okay.  And was there -- what's the reason why you went up

10   to Sulaymaniyah on December 14th?

11   A.   The consul general had been notified a couple of days

12   prior to that that there were some Americans that were --

13   that were located by the PUK in Sulaymaniyah, and they were

14   claiming to be Department of State employees.  And that

15   individual had sent an email to the consul general, who ended

16   up sending an email on that Saturday, the 12th, which I was

17   cc'd on, and the consul general said, "Do we know how these

18   people are employed?  Who they are first of all; and second

19   of all, how they are employed by the U.S. Government, can we

20   try to find that out?"  And he asked some people that work at

21   the consulate to try to figure that out.

22   Q.   You mentioned PUK.  Who are they?

23   A.   I'm sorry.  So kind of the regional government in the

24   eastern part of Kurdistan is referred to as the "PUK."  The

25   regional government in the western part of Kurdistan is the

1  KDP.  But they all fall underneath what's called the KRG,

2  which is the Kurdistan Regional Government.  But they're two

3  separate governments; they have two separate armies, two

4  separate presidents.

5  Q.  Now, when you were the assistant legal attaché at the

6  consulate in Erbil in 2015, how long had you been doing that?

7  A.  In December I had been there approximately six months.

8  Q.  And normally how long is your tour there?

9  A.  It's a one-year tour normally.

10  Q.  And are you familiar with respect to the protocol with

11  the Department of State when some Americans are located by

12  the local law enforcement or others in the Kurdistan Regional

13  Government?

14  A.  I am.

15  Q.  And can you explain to the court what's the procedure?

16  A.  If an American is found in Kurdistan, located by the

17  provisional government, the regional government there, they

18  contact the Department of State.  And the Department of State

19  has the lead in assessing who that person is, what they are

20  doing, do they have a legitimate reason for being there.  If

21  it's a terrorism-related issue and clearly a

22  terrorism-related issue, that falls within the primacy of the

23  FBI.  If it's a non-terrorism-related issue overseas, it

24  falls primarily to the jurisdiction of the Department of

25  State and more so to DSS, the Diplomatic Security Services,

1  to vet.  And we found many Americas wondering around

2  Kurdistan that had committed no crime, but it's our

3  responsibility to find out who they are and why they are

4  there.  And that's what our mission was there:  Who are these

5  people and are they here legitimately?

6  Q.  So I think you indicated you took a four-hour travel up

7  to -- where?  Where did you go to?

8  A.  Sulaymaniyah.

9  Q.  And did anyone go with you?

10  A.  Yes.

11  Q.  Who went with you?

12  A.  A representative from the Department of State, from the

13  consular section, a female.  I believe her name was Michelle

14  Perrin.  And Eric Song, who was the DSS agent, who kind of

15  had the led initially on figuring out -- trying to verify who

16  these people are.  And myself and a translator.

17  Q.  And a DSS agent is a Diplomatic Security --

18  A.  Diplomatic Security Services for the Department of State;

19  yes, sir.

20  Q.  And who was that agent?

21  A.  Eric Song.

22  Q.  So y'all went up there, and what happened?  Where did you

23  go to, first of all?

24  A.  Initially, the frustration was, the 12th was a Saturday.

25  So we get the email that says who are these people, and I'm

 1   trying to communicate back to the United States and say -- we

 2   all were, like, who are these people, are they working for

 3   contract services.  And just because it was the weekend, you

 4   know, we didn't get a whole lot of information.  Very brief

 5   pieces of information, just that there was nothing

 6   significantly derogatory.  So we decided we were going to go

 7   interview them anyway.  That might expedite the process.  You

 8   can tell us who you work for, and we can verify it.

 9       So we traveled out on the first day that we could after

10   the convoy was set up, and we went out there on Monday, which

11   was the 14th.

12   Q.  What do you mean by when the convoy was set up?

13   A.  In order to travel from Erbil to Sulaymaniyah during this

14   time, you had to send a recognizance party, you had to secure

15   the route, you had to get an advanced party to secure your

16   movement before you can -- you can't just get in a car like

17   four or five cars and drive across the country.  So it takes

18   a couple of days to put that all together, to coordinate with

19   them.  And that's why we ended up going out -- and we tried

20   hard to get as much information as we could before we went

21   out.  And we finally arrived Monday morning -- we left very

22   early Monday morning and got there early Monday morning.

23   Q.  And when you got there, where did you go to?

24   A.  We went to what is the guesthouse.  It's a senior leader

25   of the PUK government, it was the guesthouse.

*Michael Connelly - Direct*

1    Q.  And can you describe this guesthouse?  Let me ask, had

2    you ever been there before?

3    A.  No, sir, I had never been there.

4    Q.  This was the first time you had been there?

5    A.  To that guesthouse.  I've been to Sulaymaniyah, but that

6    guesthouse was the first time.

7    Q.  Okay.  And when you arrived there, can you indicate what

8    security existed around that particular guesthouse?

9    A.  I would describe that there was significant external

10   security that surrounded the roads and the exterior of that

11   compound.

12   Q.  And the security, were they dressed in uniforms, or were

13   they dressed in plain clothes, was it a mixture, or what?

14   A.  It was kind of a mixture of police uniforms and some

15   plain clothes guys.  Like, it would have been a head of state

16   type of residence that you would see, like Secret Service

17   type of protection.  It wasn't like standing army type of

18   protection, or, you know, prison type of protection.  It was

19   like a mix, like plain clothes security folks.

20   Q.  And do you recall approximately what time you arrived on

21   the 14th?

22   A.  It was probably between approximately 9:30 and 10:00 that

23   morning.

24   Q.  Okay.  And what happened?  Where did you guys go?

25   A.  So we walked inside, and they knew the purpose of what we

*Michael Connelly - Direct*

1   were coming there to do.  So we asked to speak to the five

2   people that were detained.  And we sat at a big banquet table

3   inside of this residence where there's -- they brought all

4   five of these individuals in.

5       And then the protocol is always, you meet with American

6   Citizen Services.  They told everybody what the situation

7   was, what they expect from the American Government, you know,

8   why they are there.  And then we started to talk to each

9   person one by one following that.

10  Q.   Okay.  Now, were you present when the consular officer,

11  Department of State, had this American Citizenship Services

12  discussion?

13  A.   Correct, yeah.

14  Q.   And what was said, essentially?

15  A.   She basically said -- she introduced who we were, we are

16  representatives of the government.  Asked them if there is

17  any family member that they wanted to have contacted and

18  required that they sign a waiver; because, otherwise, we

19  can't discuss the situation with family members back home, to

20  describe.  And I believe some of them did sign waivers, but I

21  don't recall specifically.  But she tells you an overview of

22  what services they can provide.

23  Q.   And you were present for that?

24  A.   I was present; yes, sir.

25  Q.   And was this done individually or together with

1  Ms. Giovanni and some of the others?

2  A.  There was a briefing done collectively.  But then when

3  each individual person came in, they addressed the issue of,

4  like, would you like us to contact somebody on your behalf;

5  and, if so, sign this waiver.

6  Q.  Okay.  Can you describe the interior of this guesthouse?

7  A.  I mean, by Kurdistan standards, it was very palatial.  It

8  looked like a senior dignitary's residence where he would

9  bring guests.

10  We were sitting at a big banquet table.  There was a big

11  kitchen next door.  There was food all over the place.  There

12  were guest rooms that surrounded this big living room type of

13  area.  We didn't get a full tour, but we saw all of the rooms

14  immediately surrounding where we were at.

15  Q.  Did you talk to anyone or did you learn that, in fact,

16  there were cooks there for Ms. Giovanni and the others to

17  cook meals for her and what have you?

18  A.  They prepared food for us.  There were people coming in

19  with like trays of vegetables and fruits and drinks.  So

20  there definitely was a service staff that was operational

21  inside of that facility.

22  Q.  Now, were you present when the consular officer actually

23  spoke to Ms. Giovanni about services available?

24  A.  Yes.

25  Q.  Okay.  And did she at any time indicate -- what did she

1   indicate?  What did Ms. Giovanni say to the consular officer

2   in your presence?

3   A.  I don't recall her -- that was a very quick briefing.  I

4   don't recall her saying anything to the consular officer

5   until they had the one-on-one where they were discussing who

6   she wanted to have -- who did she give the United States

7   permission to discuss her situation with.

8   Q.  What did she say?

9   A.  I believe it was her mother.  I don't remember.  They

10  were working on some forms.  I wasn't privy to what was

11  actually written on the forms, but I think she asked that her

12  mother be contacted.

13  Q.  As a result of that, did you and special agent -- is it

14  Song?

15  A.  Yes.

16  Q.  S-o-n-g.  Did y'all ask Ms. Giovanni if she wanted to

17  talk to y'all?  Tell me how that came about.

18  A.  So as soon as I got done with the group, we explained to

19  them as part of the group, we don't know who you are, we

20  don't know why you're here, we would like to be able to talk

21  to you about what brings you here.  But we wanted to do it

22  one by one.

23      So the group disbursed.  Ms. Giovanni stayed there.  And

24  before we asked any questions, we read her her *Miranda*

25  rights.  Actually, Eric Song read her her *Miranda* rights.  I

1    witnessed that.  And after she waived her rights, then we

2    started asking her questions.  Tell us who you are.

3    Q.   Okay.  And at this point did you have any investigation

4    going on with respect to Ms. Giovanni?

5    A.   No, I didn't have any.

6    Q.   Did you know anything about her at that time?

7    A.   We did receive information that there was some open

8    source information that she may have been, like a civil case

9    that had happened in the past.  But we didn't know anything

10   about what we subsequently learned days later about her

11   activities in Kurdistan.  At that point in time we just knew

12   that she was here, she had been here for a certain period of

13   time, and she had a prior history, like, as I recall, like a

14   civil case against a law firm.

15   Q.   Here in the United States you're talking about?

16   A.   Correct.  An old one, but there's -- I asked if there was

17   any pending FBI investigation or any, and I was told that

18   there was none against her.

19   Q.   So when you went to interview her, was this to determine

20   whether she committed some crime?  What was the purpose of

21   your interview?

22   A.   Primarily it was the assistance to the Kurdistan

23   Government.  They said, can you verify that she's employed by

24   the U.S. Government so that we can let her go about her

25   business.  And I said at that point, Monday, I couldn't get

1  anybody -- it was a weekend.  I couldn't get anybody on the

2  phone.  I did try.  I did criminal checks, which came back

3  negative.  So I had no -- there was no crime that I was

4  investigating.

5      The only concern I had was the fact that she was

6  representing herself as a Department of State employee, and

7  the Department of State told me she's not an employee.  So I

8  don't know if that's a crime or not.  But all I had to do was

9  to try to find out who she was working for.  Was she

10  contracted by DOD, contracted by DOS?  Give me your

11  information, I'll go verify it.

12  Q.  Before you interviewed her, did you ask her about her

13  physical condition and how she was being treated and what the

14  situation was?

15  A.  Yes, sir, we asked all of them.

16  Q.  And did she indicate that they had separate rooms for

17  each of the individuals there?

18  A.  They actually took us through the rooms where each one of

19  them was staying, each one of the five people were staying.

20  We got a look inside of their room.

21          MR. KUNZ:  Your Honor, may I approach the witness?

22          THE COURT:  You may.

23  BY MR. KUNZ:

24  Q.  I show you what is marked as Government's Exhibit 6 for

25  identification.  Can you take a look at that?  Do you

1    recognize that, sir?

2    A.  I do; yes, sir.

3    Q.  And what is that?

4    A.  That's the Department of State, Advice of Rights form

5    that I witnessed Ms. Giovanni sign at 10:00 in the morning on

6    the 14th.

7    Q.  Okay.  And if there is a -- if you go to page 2 on this,

8    what is that, a copy of her passport?

9    A.  Her U.S. passport, yes, sir, a copy of her passport.

10   Q.  So is this the actual original *Miranda* sheet?

11   A.  That's a copy of one, yes.

12        MR. KUNZ:  Your Honor, I'd offer Exhibit 6 into

13   evidence.

14        THE COURT:  Government's 6 is admitted.

15   (GOVERNMENT EXHIBIT NO. 6:  Received in evidence.)

16   BY MR. KUNZ:

17   Q.  Now, so before you started -- before you started speaking

18   with Ms. Giovanni, her rights were read to her by you or by

19   Agent Song?

20   A.  Agent Song.

21   Q.  And he read it basically off the sheet?

22   A.  Right off, verbatim.

23   Q.  And what was Ms. Giovanni's response?

24   A.  She said she -- she was very cooperative, very friendly,

25   very outgoing.  She wanted to explain why she was there.  She

*Michael Connelly - Direct*

 1   said she was there legitimately, and she wanted to tell us

 2   how we can prove that, to expedite her release, is what she

 3   was hoping.  That's what she articulated to me she wanted to

 4   be, you know, to explain her situation so she could be

 5   released.

 6   Q.  And did she sign this -- who printed this name Amanda K.

 7   Giovanni?

 8   A.  She did.  She signed.

 9   Q.  Do you recognize Ms. Giovanni in court today?

10   A.  I do; yes, sir.

11   Q.  Would you point her out?

12   A.  She is sitting right there at the table, the third person

13   in.  The fourth person in -- I'm sorry -- from me.

14   Q.  So she signed that in your presence; is that correct?

15   A.  Yes, sir.

16   Q.  And Agent Song signed it as well?

17   A.  He did; yes, sir.

18   Q.  And who listed the date and the -- the date and time and

19   the location, Sulaymaniyah?

20   A.  Eric Song.

21   Q.  Okay.  Now, can you explain to the court, why did you

22   provide her with the *Miranda* rights at that point?

23   A.  I mean, I didn't have any evidence that she participated

24   in any crime.  I didn't know whether it was a crime that

25   you're impersonating a Department of State person.  So in an

*Michael Connelly - Direct*

1    abundance of caution, we advised her of her rights.  We

2    decided that we were going to advise her of her rights.

3        Our intention was clearly to obtain some information

4    about who she was with.  But, again, it was an abundance of

5    caution we Mirandized everybody -- well, four of the five

6    people that were detained, all four U.S. citizens we

7    Mirandized.

8    Q.  Now, did she -- essentially, after you went through the

9    rights, she indicated she wanted to talk to you, right?

10   A.  She did.

11   Q.  Did you ever make any promises to her that -- you

12   conditioned her speaking with you on you helping her to get,

13   you know, released from the guesthouse where she was

14   currently staying?

15   A.  I've never promised anybody in my entire time in Iraq,

16   any defendant, any sort of perks or benefits, because I have

17   no control there.  I don't -- nobody is in U.S. custody.  FBI

18   has no authority there.  So I did not promise her anything.

19   Q.  Did you have any discussion with her, between you and

20   Agent Song, with respect to that matter, that y'all had no

21   control over her being in that location?

22   A.  Many times.  That day and many times -- that's part of

23   the initial brief she gets.  We are not -- you're being

24   detained by the Kurds.  We were hopefully helping her out in

25   a way by saying, "If you can tell us, tell me who I can

1    call," is what I told her, "and I'll call that person.  If

2    you legitimately are here, I would be glad to tell the Kurds

3    that you are legitimately here."  But I had no evidence as of

4    Monday to corroborate her story.  So that's what I was

5    looking for, was let me know who I can call.

6    Q.  You actually interviewed her and you prepared a 302

7    summarizing the statements that she made to you; is that

8    correct?

9    A.  That's correct, sir.

10   Q.  Now, when you had completed your interview with her, what

11   happened?  What did you do?

12   A.  My interview lasted probably -- our interview, I should

13   say, lasted approximately an hour, because we had Mirandized

14   the next guy by I think 11:11 in the morning, the second guy

15   we had spoke to.  But we talked to each individual, and we

16   said, "Can you explain -- can you give us some sort of

17   corroboration as far as why you are here?"  Same exact

18   protocol we did -- procedure I did with Ms. Giovanni.

19   Q.  Now, I think you may have indicated, how many people were

20   there at that guesthouse at the Kurdistan --

21   A.  How many from my movement that went out there?

22   Q.  No.  I'm sorry.  How many were there living in or staying

23   temporarily in that location?

24   A.  There was five people that we were told that the Kurds

25   were trying to find out who they were:  four U.S. citizens

*Michael Connelly - Direct*

1   and one non-U.S. citizen.

2   Q.   Now, the non-U.S. citizen, was that a translator that

3   Ms. Giovanni said was with her?

4   A.   She said she hired him to come and do translation

5   services.

6   Q.   Is he a U.S. citizen?

7   A.   He was not; no, sir.

8   Q.   And did you interview him?

9   A.   Yes.

10  Q.   Did he agree to be interviewed, or did he say he didn't

11  want to talk?

12  A.   He agreed to be interviewed.

13  Q.   Okay.

14  A.   And after about five minutes, he said, "I don't think I

15  want to answer any more questions."  So it's a 302 report,

16  very short, and we said, "Okay.  If you don't want to answer

17  questions, fine by us."

18  Q.   Okay.  So now after you had interviewed Ms. Giovanni, did

19  you -- before you left, did you give her any indication in

20  any way, any words or promises or guarantees, that, you know,

21  you would do something because she had spoken to you?

22  A.   I made no promises, but she did give me three or four

23  names and phone numbers.  She said, "If you call these

24  people, they can tell you who I am."  I didn't promise her

25  that I was going to call them, but I did call them.  But to

1    answer your -- promises, guarantees, no, sir.

2    Q.  And is there any doubt in your mind that the *Miranda*

3    rights were given to her prior to you guys having any

4    discussions with her?

5    A.  Absolutely done prior to any discussion that we -- Eric

6    Song and I had.  The ACS piece went before the *Miranda*, but

7    that wasn't an interview.  That was just a one-way providing

8    of information.

9    Q.  Did there come a point in time -- let me ask you.  Did

10   you go back out and meet with Ms. Giovanni again?

11   A.  Not in Sulaymaniyah.

12   Q.  Okay.

13   A.  I never -- she left the country and came back into the

14   country, then I met with her again after she came back in the

15   country.

16   Q.  That's in the spring of 2016?

17   A.  Yes, sir, May of 2016.

18   Q.  Do you have any -- were you aware that after several days

19   she was released by the Kurds?

20   A.  I did become aware of that; yes, sir.

21   Q.  You hadn't followed up with respect to her; is that

22   correct, after that happened?

23   A.  I wasn't as an investigator, but American Citizen

24   Services was responsible at that point.  Since she's not

25   being charged by anything that I had any knowledge of, so it

1   wasn't a law enforcement issue as much as an American Citizen

2   Services issue.

3   Q.  Having spent a year over there as an assistant legal

4   attaché, did you ever encounter situations where individuals

5   had been arrested by the Kurdish Government and placed in

6   some sort of detention facility?

7   A.  Yes, sir, absolutely.

8   Q.  And were those jails, basically?

9   A.  They were; yes, sir.

10  Q.  The place, this palace or the guesthouse that you

11  described, did that link to one of the members of the Kurdish

12  Government?

13  A.  The PUK Government; yes, sir.

14  Q.  And is that something that you had encountered before,

15  someone being there temporarily?

16  A.  I've never encountered anybody being there at that

17  residence temporarily.

18  Q.  Now, are you familiar with respect to the interactions of

19  the Kurdish Government or the PUK with Americans?

20  A.  Generally, but I was in the KDP region, so I had very

21  limited interactions with the PUK Government.

22  Q.  Well, with respect to any interactions you had there,

23  what was their feeling towards Americans?

24  A.  They love -- Kurds love Americans, and they disparately

25  need our assistance, because we were paying for their

1   soldiers, we were paying for their police officers, we were

2   providing the military equipment.  The most important thing

3   to them at that point, when ISIS was the calamities outside

4   of the city, was that they had a great relationship with

5   Americans, and that they showed that they were going to

6   protect the Americans if we were going to be there,

7   consulates, our movements, citizens.

8   Q.  Did you either tell Ms. Giovanni, or someone else in your

9   presence, indicate to her that they were there for their

10  protection based on the situation in Kurdistan?

11  A.  Did I ever indicate that to Ms. Giovanni?

12  Q.  Yes.

13  A.  I don't know that I ever told her that specifically.

14  Q.  Did she explain to you what she was doing there, what had

15  happened?

16  A.  She provided an explanation of what her purpose was

17  there, she did.  I was unable to corroborate it, but she

18  provided an explanation.

19  Q.  Sir, did you or Agent Song make any threats to

20  Ms. Giovanni to speak to you that day?

21  A.  Never.

22  Q.  Okay.  Or to sign a *Miranda* sheet?

23  A.  Never.

24         MR. KUNZ:  I have no further questions of this

25  witness, sir.

1      THE COURT:  Cross-examine?

2      MS. SILVER:  Yes, Your Honor.

3                          CROSS-EXAMINATION

4  BY MS. SILVER:

5  Q.  Good afternoon, Agent Connelly.

6  A.  Good afternoon, ma'am.

7  Q.  So, just to go back a little bit about the situation in

8  Kurdistan around this time in December of 2015, from your

9  testimony I understand that you had concern of U.S. citizens

10  there, extensive concern?

11  A.  Very extensive concern, yes.

12  Q.  And this concern was brought about about what a tense

13  period of time this was over there in that area, right?

14  A.  Yes.

15  Q.  With a lot of terrorist activity?

16  A.  Absolutely.

17  Q.  That could threaten the lives of American citizens,

18  right?

19  A.  Correct.

20  Q.  And your biggest concern was the security and safety of

21  U.S. citizens that are there in that area of the world,

22  right?

23  A.  My biggest concern wasn't that.  I would say that was the

24  Department of State's biggest concern.  My biggest concern

25  was conducting criminal investigations.

*Michael Connelly - Cross*

24

1  Q.  Okay.  Well, maybe not on the list of priorities, but

2  would you agree that part of your concern would be about the

3  safety and security of the U.S. citizens in that area, right?

4  A.  Absolutely right; yes, ma'am.

5  Q.  That you were there for your one-year tour?

6  A.  Absolutely, right.

7  Q.  And it was a very tense period of time?

8  A.  Very tense.

9  Q.  Now, Michelle, was she a representative with the U.S.

10 Consulate?

11 A.  She was the assistant consular officer.  So she was a

12 Department of State employee for the consulate.  She worked

13 in the consular section, but she wasn't the consular officer,

14 she was the assistant.

15 Q.  I understand.  And so that the U.S. Consulate, is it fair

16 to say that many American citizens understand the U.S.

17 Consulate to be in different areas of the world, right?

18 A.  Yes.

19 Q.  And their purpose there is to help and aid Americans when

20 they are there in a foreign country, right?

21 A.  I would agree.

22 Q.  Right?  I mean, that's generally what people know, and so

23 if you say, "Hi, I'm a U.S. Consulate," it's like the citizen

24 goes, "Oh, thank God, you're here," right?  "Let me tell you

25 what's going on," right?

1   A.   Normal citizens would.  I would say that -- and I'm not

2   saying -- I would say that the criminals that I dealt with

3   didn't see that the same way.

4   Q.   Okay.

5   A.   They would see the Americans as that's a problem.  "If

6   the Americans are coming to me, that means that's a problem."

7   But I would say for the typical innocent civilian citizen,

8   they would say that, welcoming, open arms.

9   Q.   They were happy that you were there?

10  A.   Yes, ma'am.

11  Q.   You would agree that you and Agent Song went to this

12  residence with the representative of the U.S. Consulate, with

13  Michelle -- what was her last name?

14  A.   Michelle Perrin, I'm almost positive it was her.

15  P-e-r-r-i-n.

16  Q.   Perrin?

17  A.   Yes.  I'm also positive that was her.  I went out on many

18  interviews, but on that one I'm pretty sure it was Michelle

19  Perrin.

20  Q.   Right.  So on this particular day, December 14, 2015, you

21  arrived as a member of the U.S. Consulate like as a group,

22  y'all were coming in together into this residence, right?

23  A.   We were all members of the U.S. Consulate.  I'm under the

24  authority of the consul general, so I'm typically a member of

25  the consulate overseas.

*Michael Connelly - Cross*

1    Q.  Did you let Ms. Giovanni know that and say, "Hey, I'm

2    part of the U.S. Consulate"?

3    A.  Absolutely.  We introduced ourselves individually and --

4    Q.  Would you agree that, when she found out who you were

5    with, that she was very cooperative with you and forthcoming

6    with you, right?

7    A.  I would say cooperative.  But in forthcoming you're

8    saying honest, I would say no.  Willing to provide

9    information --

10   Q.  At the time she spoke to you, did she appear willing to

11   provide information to you?

12   A.  Willing to provide information, yes.

13   Q.  Okay.  Did she seem to be cooperative in wanting to speak

14   with you guys?

15   A.  In wanting to speak with us, right.

16   Q.  Right?  Okay.

17   A.  I wouldn't say cooperative, though.  I would say she was

18   willing to speak with us.

19   Q.  Okay.  I thought before you stated she was cooperative.

20   A.  Yeah, but I guess in detail -- if you consider providing

21   false information is not necessarily cooperative, but she was

22   willing to speak with us, so --

23   Q.  I'm just looking at -- you said that my client was very

24   cooperative and very friendly to expedite her release, right?

25   A.  Yes, I did say that.  Yes, I'm fine with that.

1    Q.  Okay.  That's good.  And prior to any *Miranda*,

2    Michelle -- Ms. Perrin, she was checking on the well-being of

3    the U.S. citizens there that were kept at this location,

4    right?

5    A.  Yes.

6    Q.  Is everybody okay?  Have you been mistreated?  Have you

7    been fed properly?  Making sure that their physical and

8    mental well-being is okay, right?

9    A.  Yes, she did.

10   Q.  Because that was a primary concern initially upon meeting

11   with the group?

12   A.  Yes, it was.  And it was ours, too, we asked the same

13   questions.

14   Q.  Exactly, right?

15   A.  Yes.

16   Q.  And so initially you would agree that Ms. Giovanni

17   understood from you and the other member of the U.S.

18   Consulate that y'all were making sure she was okay, that

19   y'all were concerned about her well-being, right?

20   A.  I would say, yes, she saw us as generally concerned about

21   her well-being.

22   Q.  And is it fair to say that, when you were making this

23   introduction and checking on their well-being, that you said,

24   you know, that you said, "You can call me Mike"?  Was it on a

25   first-name basis?

 1  A.  I don't ever recall saying that, but I wouldn't be upset

 2  if she called me Mike.  I've never introduced myself in an

 3  interview like that.

 4  Q.  Well, not saying, "I'm Mike," but you introduced

 5  yourself, and do you recall as part of that introduction that

 6  you were saying, "Y'all feel free to call me Mike"?

 7  A.  I don't recall saying that at all.

 8  Q.  You don't recall that?

 9  A.  No.

10  Q.  What about Agent Song?  Did he say the same, "I'm Special

11  Agent Eric Song, you know, y'all can feel free to call me

12  Eric"; that this was on a first-name basis?

13  A.  I don't ever remember any interviews we did of either one

14  of us saying that over there.

15  Q.  Do you agree that Eric Song gave Ms. Giovanni his card

16  and said, "If you need anything when you get out, please give

17  us a call"?

18  A.  I didn't see it, but I wouldn't contest it.  We would do

19  that, yes.

20  Q.  Because part of what y'all were doing is you were hoping,

21  right, that they would get released?

22  A.  Absolutely.  I hope we can verify her story, yes.

23  Q.  And in the event -- you were hoping to verify her story,

24  right?

25  A.  Yes.

1   Q.  Okay.  Because you knew at the time that if you could

2   verify her story then that would get her released, right?

3   A.  I didn't know that.  I could make recommendations to the

4   Kurdish Government, but I would say many of mine were not

5   adhered to.  All we can do is say -- they're asking for

6   information, are they employed by the U.S. Government, and we

7   were the vehicle to say yes, they were or, no, they weren't,

8   at that point in time.  And what they do after that, it was

9   never going to be, you need to release her.  It's their

10  decision, because I don't know what they're necessarily doing

11  with that, with any investigation.  They don't owe us an

12  explanation, either.  So, we were more or less trying to

13  answer their question, why are they here.

14  Q.  But as far as you understood Kurdistan was saying, we've

15  got an issue for these reasons, and you were trying to negate

16  those reasons, because that was what you believe would help

17  expedite her release, right, whether it would happen or not

18  is a different question?

19  A.  Yes, yes.

20  Q.  And you would agree, prior to this interview, there was

21  no open investigation against Ms. Giovanni, right?

22  A.  Again, remember, this happened on a Saturday.  I'm trying

23  to get information from the United States on Saturday and

24  Sunday.  I had one person to run checks, the only person I

25  could get ahold of.  There was no open pending investigation

1   on Ms. Giovanni that I recall being aware of at that time.

2   Q.   Back on December 14th?

3   A.   On the 14th, December 14th.

4   Q.   With the FBI?

5   A.   Yeah.

6   Q.   As you sit here today, did you later become aware that

7   the FBI, in fact, did have an open investigation at that time

8   against Ms. Giovanni?

9   A.   I can't say that I knew it was open at that time.   I

10  became aware later that there was investigative interest by

11  the FBI in Ms. Giovanni, but I don't know when that started.

12  Q.   Starting in December of 2015?

13  A.   I didn't know if it was running in December.   I can't say

14  that I knew it was open in December, because the information

15  we got about her criminal activity came to me after I

16  interviewed her.

17  Q.   Okay.

18  A.   So that was the first time I heard of any sort of

19  criminal activity on her part.

20  Q.   And that was after you were in contact with her?

21  A.   After the 14th, correct.

22  Q.   When you are meeting with her, we established what we've

23  established so far, but prior to any interview, you were not

24  aware of any illegal activity being done by Ms. Giovanni; you

25  could not say that there was illegal activity being done,

1  right?

2  A.  Pending criminal investigation.  Remember, I said there

3  was some inferences of prior, you know, fraud.

4  Q.  Civil?

5  A.  Civil.  I remember one was a civil issue.

6  Q.  Criminal and whether -- the question is specific.  At the

7  time you met with Ms. Giovanni in December of 2015, right

8  there in Iraq, you were not aware that the Government, the

9  FBI, was investigating Ms. Giovanni for criminal conduct?

10  A.  Correct.

11  Q.  Right?

12  A.  Right.

13  Q.  And you looked up to see if there was any criminal

14  conduct, right?

15  A.  I had somebody do a search for me.

16  Q.  Right.  To see if she had ever been arrested before?

17  A.  To see if there was a pending case.

18  Q.  And there was no pending case?

19  A.  As I recall, the email that came back to me said there is

20  no pending case on her.  So I didn't go there with a list of

21  questions about a case, because I didn't know of any at that

22  point in time.

23  Q.  And you would agree that at the initial part of the

24  interview, prior to the interview, okay, and prior to this

25  *Miranda* rights form, would you agree that Ms. Giovanni was

*Michael Connelly - Cross*

 1   making an expression to you about her concern and fear of her

 2   situation, where she found herself at that time, right?

 3   A.  I wouldn't say fear.  I'd say more concern about wanting

 4   just to be released.

 5   Q.  Released?

 6   A.  Yes, she wanted to leave.

 7   Q.  Were you aware that she had never been arrested before?

 8   A.  I wasn't aware of that.

 9   Q.  Okay.  As you sit here today, did you later find out she

10   had never been arrested before, right?

11   A.  Sitting here today, I don't know that.

12   Q.  Okay.  Certainly, she was never arrested -- while you

13   were there in Kurdistan, you had never known that she had

14   been arrested, right?

15   A.  Absolutely.

16   Q.  So for all intents and purposes, as far as you know, this

17   could have been the very first time that Ms. Giovanni was

18   detained in this very tumultuous, very dangerous area of the

19   country?

20   A.  Correct.

21   Q.  Right?

22   A.  But I wasn't aware --

23   Q.  And arrested by a foreign country, right?

24   A.  Correct.

25   Q.  And at that time were you aware of the reports that had

1  gone out, issued by our government about Iraq 2016 and human

2  rights reform?

3  A.   I was about Iraq.  Kurdistan and Iraq are two different

4  entities.  So that report you're referring to, a section

5  about Kurdistan and largely about the ISF, which is the Iraqi

6  Security Forces, and their detention facility.

7  Q.   The KRG?

8  A.   So that was a big issue there.  I'm very familiar with

9  that report, yes, exactly.

10  Q.   And that there were times that people have been detained

11  for lengthy periods of time without going before judge and

12  seeing anybody, right?

13  A.   There was verbiage to that, yes.

14  Q.   And here, we're in a situation where you knew and

15  understood that Ms. Giovanni and the gentleman that she was

16  with they had been detained for 48 hours?

17  A.   Again, I saw the email on the 12th that they were

18  detained.  So I knew that at least as of the 12th, right,

19  which is about 48 hours as of the 14th, that they had been at

20  that guesthouse.

21  Q.   Do you think they could have been there earlier than the

22  12th?

23  A.   I wouldn't think anybody would hold Americans in that

24  country without telling the consul general.  So I would think

25  that as soon as the consul general was told, I would think it

1    was pretty close to when they actually stumbled upon them.

2    Q.  So we're assuming here now that it's about 48 hours that

3    Ms. Giovanni and the gentleman that she was with were

4    detained at the guesthouse?

5    A.  Right.

6    Q.  We're calling this a guesthouse, right?

7    A.  Yes.

8    Q.  But this wasn't a situation where Ms. Giovanni or any of

9    the gentlemen she was with, it's okay, bye, thanks for the

10   refreshments, but --

11           THE COURT:  Look, I've got this, and I've sat here

12   and let everybody go as long as they want.  You're the

13   unfortunate one to be at the desk when I need to make this

14   announcement.  Folks, we've been here too long, we need to get

15   right to it.

16           MS. SILVER:  Okay.

17           THE COURT:  So new information only.

18           MS. SILVER:  Yes, sir.

19           THE COURT:  Not fair to tell you that, because you've

20   taken less time than any of the lawyers.

21           MS. SILVER:  I understand.  It's the position I'm in,

22   and I will get there, Your Honor.  Thank you for that.

23   BY MS. SILVER:

24   Q.  So at this residence there were lots of armed guards?

25   A.  The exterior of the residence.

*Michael Connelly - Cross*

1   Q.   Okay.  You didn't go throughout the entire residence,

2   right?

3   A.   Correct.

4   Q.   And you don't know what was going on in the residence

5   when you weren't there?

6   A.   Absolutely, right.

7   Q.   These armed guards, they had large like rifle type

8   machine guns?

9   A.   The exterior ones, yes, like mounted on the back of a

10  truck and --

11  Q.   Right.  Do you recall there being two or more trucks in

12  the front of the residence with big -- I don't know what

13  they're called.  Do you know what I'm talking about?

14  A.   Yeah.  I saw one of the trucks, yes.  You're right, there

15  was a truck at the front gate.

16  Q.   Like a large machine gun at the top of the truck, right?

17  A.   Absolutely right, at the front gate.

18  Q.   Do you recall if these armed guards would have two, one

19  rifle that they are holding and one machine gun strapped to

20  their back?

21  A.   I didn't get that close a look, but I did see the truck.

22  Q.   But you would agree that they could have had that, right?

23  A.   Possibly, absolutely.  That would be very reasonable.

24  Q.   Would you agree that there's probably about 40 of those

25  people, when you're saying mixed group, like secret service

1  type suits wearing and police officers uniform wearing,

2  surrounding that area?

3  A.  I don't think I saw more than ten.

4  Q.  That's what you observed?

5  A.  Correct.

6  Q.  Did you walk around the perimeter?

7  A.  No.

8  Q.  Did you go on the roof?

9  A.  I did not go on the roof.

10  Q.  Did you look on the roof?

11  A.  I did not go on the roof.  I didn't see on the roof.

12  Q.  I understand you told the government that you didn't

13  promise my client and said, "I promise you this, I guarantee

14  you this," but let me ask you this:

15      Did you let her know that you were there to help?

16  A.  No.  I just told her I needed to verify her information;

17  and, if she was able to provide me information, then -- I

18  don't think I ever used the term, you know, that my purpose

19  here is to help you.  My purpose is to find out why you're

20  here.

21  Q.  Did you let her know that if you could find out that

22  information, the purpose of why she's here, that that would

23  expedite her release?

24  A.  No.  I cannot make any promises in that country, because

25  I don't control anything.

1  Q.  I'm not talking about a promise.

2  A.  Yeah.  I can't say, "I can help you," because the

3  decision relies with the Kurds.  I don't detain anybody

4  overseas.  I don't have the authority.  I can't ask them to

5  do that.  That is their decision.  All I could do is, if they

6  want to know if she's here under the U.S. Government

7  officially, I can tell them that.  Now, what they decide to

8  do, is up to them.

9  Q.  Now, this Exhibit 6, I believe your prior testimony was

10  that there was another document, an APS document?

11  A.  I don't remember.

12  Q.  APS?  There is a document about people could list --

13  A.  Oh, ACS.

14  Q.  ACS, is that it?

15  A.  Yes.

16  Q.  Is that where emergency contacts --

17  A.  Correct.

18  Q.  Just in case anything would happen to them?

19  A.  Well, if you want us to reach out -- like, when we detain

20  Americans overseas, we're like, "We'll call your parents for

21  you, if you want us to."  Some people say, "No, I don't give

22  you permission to."

23  Q.  And would you agree that that information was being

24  provided to Ms. Giovanni at the same time as this rights form

25  was being shown to her?

1    A.  It was before.

2    Q.  Right before?

3    A.  Not immediately, contemporaneous.  Probably it was

4    presented to her -- relatively, like, obviously, the whole

5    interview was an hour.

6    Q.  Okay.  So like within a minute?

7    A.  A few minutes, potentially, yeah.

8    Q.  Two, three?

9    A.  Again, I don't know.  A few minutes.

10   Q.  So then before this rights form comes up, y'all are

11   trying to get emergency contact information to help contact

12   people that she wants y'all to contact, right?

13   A.  Michelle was.

14   Q.  And you were there?

15   A.  I was there, yes.

16   Q.  Right?  Do you agree that this *Miranda* rights form talks

17   about your ability to provide Ms. Giovanni with counsel based

18   on your location?

19   A.  That is one, yes.

20   Q.  Okay.  And that it may be limited?

21   A.  Correct.

22   Q.  Okay.  Do you recall that Agent Song told Ms. Giovanni,

23   "Look, it's going to be really hard for us to get an attorney

24   here on where we are"?

25   A.  I don't remember him saying that.

1    Q.  You don't recall it was said?

2    A.  I don't recall that being said.

3    Q.  But it could have been said; I mean, you can't remember?

4    A.  A paragraph of that form says that -- it speaks to that

5    issue, that it's difficult to get somebody should you want a

6    U.S. trained attorney.  Getting an attorney -- ACS normally

7    would provide a list of Kurdish attorneys to these folks.  If

8    you want an U.S. trained attorney, is what the form says,

9    that may be a problem.

10   Q.  Let's look at it.  It says, "Our ability to provide you

11   with counsel."  It speaks for itself, sir.

12           THE COURT:  And that's the point.

13           MS. SILVER:  And I'll move on.

14           THE COURT:  I've read it.

15           MS. SILVER:  I know, Your Honor.

16   BY MS. SILVER:

17   Q.  So, then, would you agree that it's not unreasonable that

18   Agent Song could have communicated that to Ms. Giovanni in

19   saying, "Look, it would be very difficult for us to get you a

20   lawyer"?

21   A.  Possibly, yeah.

22   Q.  Do you recall Ms. Giovanni saying that she did have a

23   lawyer in the U.S.?

24   A.  No, nope.

25           MS. SILVER:  Can I have a moment?  I'm sorry.

```
 1              THE COURT:  You may.

 2   BY MS. SILVER:

 3   Q.  You were aware that there are lawyers available to people

 4   in this area of the world?

 5   A.  Correct.

 6   Q.  Right?  Was there ever a list of lawyers provided to

 7   Ms. Giovanni that would be available to her?

 8   A.  Many of the interviews I went, ACS handed a list of

 9   Kurdish attorneys --

10   Q.  I'm talking about December 14th.

11   A.  I don't know that that -- whatever interaction was -- if

12   she gave that form that day to Ms. Giovanni, I don't know,

13   but there was a list.

14   Q.  That is available, right?

15   A.  What's that?

16   Q.  So that is available?

17   A.  There is, yes.

18   Q.  Was that provided to Ms. Giovanni?

19   A.  Again, I don't know what papers were exchanged between

20   Ms. Perrin and Ms. Giovanni.

21   Q.  Would you agree that you were present during the time

22   that Ms. Giovanni was with Ms. Perrin?

23   A.  Correct, yeah.  Present, but probably not paying super

24   close attention, because that's not my lane.  But she would

25   normally provide that list of attorneys to a person that
```

1   we're meeting with.  Did she on that day?  You'd have to ask

2   her.

3           MS. SILVER:  Your Honor, can I just have one moment?

4           THE COURT:  You may.

5           MS. SILVER:  Thank you, Judge.  One more note, Your

6   Honor.

7           THE COURT:  All right.

8           MS. SILVER:  Your Honor, I think we are through.

9           THE COURT:  Redirect?

10          MR. KUNZ:  Nothing, Your Honor.  Thank you.

11          THE COURT:  Thank you, Mr. Connelly.  You may step

12  down.  You are free to go about your business.

13          THE WITNESS:  Thank you, Your Honor.

14      (End of excerpt.)

15              *   *   *   *   *   *   *   *

16

17

18  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.  Any
19  redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy are noted within the
20  transcript.

21

22

23  *Judy A. Gagnon*                          *9/7/2018*
    Judy A. Gagnon, RMR, FCRR                 Date
24  Official U.S. Court Reporter

25

1                              <u>INDEX</u>

2    <u>WITNESS FOR THE GOVERNMENT:</u>                           <u>PAGE</u>

3

     **MICHAEL CONNELLY**
4          DIRECT EXAMINATION BY MR. KUNZ................... 3
           CROSS-EXAMINATION BY MS. SILVER.................. 23
5

6                    *   *   *   *   *   *   *   *

7

8
                        <u>GOVERNMENT'S EXHIBITS</u>
9

10     <u>NO.</u>:                 <u>DESCRIPTION</u>                      <u>PAGE</u>

11   6       Advice of Rights signed by Amanda Giovanni      15
             (dated 12/14/15)
12

13
                     *   *   *   *   *   *   *   *
14

15

16

17

18

19

20

21

22

23

24

25