UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY, FLORIDA


*UNITED STATES OF AMERICA,*      )
     )
               *Plaintiff,*     ) *Case No: 5:17-cr-32/RH*
     )
*vs.*      ) *Panama City, Florida*
     ) *May 16, 2018*
*AMANDA GIOVANNI, CLARK*      )
*ONSTAD, AND KENNETH COOK,*      )
     )
             *Defendants.*     )
_____ )


### TESTIMONY OF CHRISTOPHER PEKEROL


**TRANSCRIPT OF ** EXCERPT ** OF MOTION HEARING
BEFORE THE HONORABLE ROBERT L. HINKLE,
UNITED STATES DISTRICT JUDGE**

APPEARANCES:

For the Plaintiff,     Christoper P. Canova
United States of      United States Attorney
America:              By: STEPHEN M. KUNZ
                     Assistant U.S. Attorney
                     *stephen.kunz@usdoj.gov*
              111 North Adams Street
              Suite 400
              Tallahassee, Florida   32301


For the Defendant,    Todd Foster Law Group
Amanda Giovanni:      By: TODD A. FOSTER
                     MATTHIEU GODDENYE
                     NATALIA B. SILVER
                     Attorneys at Law
                     *tfoster@tfosterlaw.com*
                     *mgoddeyne@tfosterlaw.com*
                     *nsilver@tfosterlaw.com*
              1881 West Kennedy Boulevard
              Tampa, Florida 33606



APPEARANCES:  Cont'd

For the Defendant,          Downing Law Offices
Clark Onstad:               By:  JEAN MARIE DOWNING
                                 Attorney at Law
                                    *jdowning@pcbeachlaw.com*
                            2612-B West 15th Street
                            Panama City, Florida   32401


For the Defendant,          Cassidy Law Firm
Kenneth Cook:               By:  THOMAS J. CASSIDY, III
                                 Attorney at Law
                                    *cassidylawfirm@comcast.net*
                            233 East Beach Drive
                            Panama City, Florida   32401

1                    *  *  *  *  *  *  *  *  *

2         THE COURT:  Further evidence for the government?

3         MR. KUNZ:  Yes, sir.  We call Agent Pekerol with

4  respect to the search warrant of the email account, Judge,

5  that we talked about this morning.

6         THE COURT:  As long as it's new information.

7         MR. KUNZ:  It is, Judge.

8         THE COURT:  Okay.

9         MR. KUNZ:  We can do it another time.

10        THE COURT:  We're going to finish today.

11        MR. KUNZ:  I know, but the hour is late, Judge.

12        THE COURT:  Please raise your right hand.

13      **CHRISTOPHER PEKEROL, GOVERNMENT WITNESS, DULY SWORN**

14        THE COURT:  Be seated.

15        Please, state your full name and spell your last

16  name for the record.

17        THE WITNESS:  Christopher Pekerol, spelled

18  P-e-k-e-r-o-l.

19                      DIRECT EXAMINATION

20  BY MR. KUNZ:

21  Q.  Agent Pekerol, how long have you been with the IRS?

22  A.  A little over seven years.

23  Q.  And did you have occasion to submit an affidavit as part

24  of an application for a search warrant for an email account

25  known as *agiovanni@bidsteam.com*?

*Christopher Pekerol - Direct*

**4**

1    A.  Yes.

2    Q.  And was that done in the -- if you can tell me, do you

3    recall when that was done?

4    A.  I believe it was around March of 2016.

5    Q.  Okay.  And was a search warrant actually signed on or

6    about April 8, 2016?

7    A.  That sounds correct.

8    Q.  And it was addressed to a company known as Network

9    Solutions, LLC, in Jacksonville?

10   A.  Yes.

11   Q.  Now, as part of that affidavit, if you can explain, what

12   were you looking for?

13   A.  We were looking for emails of the crimes we were

14   investigating of Amanda Giovanni.

15   Q.  And, specifically, the search warrant affidavit, did that

16   include a Section B or Attachment B that explained what items

17   you were hoping to locate?

18   A.  Yes.

19        MR. KUNZ:  Judge, you already have a copy of this.

20   I'm not going to present it right now.  Let me just ask the

21   agent.

22   BY MR. KUNZ:

23   Q.  The Attachment B had two sections, right; number one

24   being information disclosed by the ISP provider; is that

25   correct?

1   A.  Yes.

2   Q.  And section two had information to be seized; is that

3   correct?

4   A.  Yes.

5   Q.  And section two gave specific direction in terms of what

6   possible crimes you were looking for and you listed

7   categories of information from A through H; is that correct?

8   A.  Yes.

9   Q.  Now, as a result of the search warrant -- you actually

10  served this; is that correct?

11  A.  I did.

12  Q.  Okay.  And did you get a response to that search warrant?

13  A.  I did.

14  Q.  Can you explain what did you do?  What was the procedure

15  in terms of your executing that search warrant, and then

16  trying to locate items that the search warrant had indicated

17  you could search for?

18  A.  Sure.  I served the search warrant on the internet -- the

19  email service provider in Jacksonville, Florida.  After they

20  gathered the information, they sent me a CD containing the

21  responsive emails.

22      I took that disc, inserted it into an evidence review

23  computer and uploaded the emails.  There was over 30,000

24  emails.  Initially, when they come into the evidence review

25  computer, it appears to be similar to like Microsoft Outlook,

1   so you can see the dates, the senders, the subject

2   information.  So, initially, right off the bat I could see

3   there was a whole lot of nonrelevant information, a lot of

4   spam, a lot of junk mail.  So I sorted the emails by sender

5   so I could easily separate the junk mail from the potentially

6   relevant emails that were going to be seizable from the

7   search warrant.

8   Q.  And did your search procedure also include names and

9   phrases, financial transactions, employees, and other

10  associates of Ms. Giovanni?

11  A.  Yes.

12  Q.  Now, during your search process, did you identify what

13  you believe to be relevant emails?

14  A.  Yes.

15  Q.  And did you review them?

16  A.  Yes.

17  Q.  Okay.  Once you identified relevant emails, do you then

18  divide them into pertinent and non-pertinent folders?

19  A.  Yes.

20  Q.  Now, once you had done that, did you come to a

21  determination as to how many actual emails you had received,

22  how many emails you had placed in the pertinent folder and

23  how many emails in the non-pertinent folder?

24  A.  Yes.

25  Q.  And what was that?

1   A.  Based on my search, I reviewed approximately 900 emails.

2   I believe it was a total of 941.  Of those I believe 741 were

3   relevant to the investigation and seizable by the search

4   warrant.  Approximately 200 of those emails were not, and I

5   separated those out.

6   Q.  Okay.

7           MR. KUNZ:  May I approach the witness, Your Honor?

8           THE COURT:  You may.

9   BY MR. KUNZ:

10  Q.  Just so we have exact numbers, this is just to refresh

11  your memory, this is an email you sent to me indicating what

12  your breakdown was.

13  A.  Yes.

14  Q.  Would you tell the court exactly the numbers?

15  A.  We received a total of 30,934 emails.  I reviewed at the

16  most 942 emails; 742 of those were pertinent and seized

17  pursuant to the search warrant; 200 were not, and those were

18  separated.

19  Q.  And, sir, I think you had spoken to me verbally prior to

20  the government filing the first response in this case, and

21  you had given me a number that was different than this

22  number; is that correct?

23  A.  Yes.

24  Q.  Can you explain that to the court, what was the mixup or

25  why was that incorrect?

*Christopher Pekerol - Direct*

1    A.   Sure.   You requested the amount of emails that were

2    reviewed.   So I looked at the folders, the pert and non-pert

3    folders, and mistakenly provided the number that was next to

4    the folder.   That number turned out to be the number of

5    unopened emails in each folder.

6    Q.   Okay.   So the original number that you told me about that

7    I indicated in the government's initial response to this

8    motion to suppress was incorrect?

9    A.   Correct.

10   Q.   But the numbers you just gave me, the government filed an

11   amended response and that is correct; is that right?

12   A.   Yes.

13            MR. KUNZ:   Thank you, Judge.   Nothing further of the

14   agent.

15            THE COURT:   Cross?

16            MR. GODDEYNE:   Yes, Your Honor.

17                         CROSS-EXAMINATION

18   BY MR. GODDEYNE:

19   Q.   Special Agent Pekerol, you have been a special agent with

20   IRS Criminal Investigation Division for seven years?

21   A.   Yes.

22   Q.   And in that seven years, you've executed other email

23   search warrants?

24   A.   I have.

25   Q.   And you received training on how to execute email search

1  warrants?

2  A.  Yes.

3  Q.  In your training, has that also included contents like a

4  taint review?

5  A.  Yes.

6  Q.  Potentially attorney-client privileged communications?

7  A.  Yes.  If we have an indication that there may be

8  attorney-client privileged information, we will have a taint

9  review done.

10  Q.  And it's also clear that, as part of the IRS Criminal

11  Investigation Division training, are there procedures in

12  place for reviewing the results of email search warrants?

13  A.  No.

14  Q.  Within all of IRS CID, there is not one procedure written

15  about how to handle electronic data received pursuant to a

16  search warrant?

17  A.  I'm not aware of anything other than what I did.

18  Q.  Let's go through that.  So on April 8, 2016, you received

19  a search warrant for Network Solutions to search

20  *agiovanni@bidsteam.com*; is that correct?

21  A.  Correct.

22  Q.  You served it that same day?

23  A.  Yes.

24  Q.  You serve it, what, by faxing it over to Network

25  Solutions?

1   A.  I don't recall if it was faxed or emailed, but I served

2   it; yes.

3   Q.  And about two weeks later on April 20th, 2016, you

4   received a response; is that right?

5   A.  That sounds correct.

6   Q.  Well, here, is there something that would refresh your

7   recollection?

8        THE COURT:  It doesn't matter what day he got it.

9   We're close.

10  BY MR. KUNZ:

11  Q.  When you got it, sir, you received two discs?

12  A.  Yes.

13  Q.  And you uploaded them in an evidence review computer?

14  A.  I uploaded one of them.  One of them was evidence, one of

15  them was just like a custodian-record type thing.  It wasn't

16  actually emails.  We use the evidence review computer for the

17  emails.  So it's separated from our system so we don't get

18  malware and those kinds of things from dirty emails.

19  Q.  And you didn't send that disc to an IT department for

20  review?

21  A.  No.

22  Q.  You didn't have a separate review team set up to

23  review --

24  A.  No.

25  Q.  -- to make sure that you didn't review things that you

1  weren't supposed to look at?

2  A.  No.

3  Q.  You didn't have a taint procedure in place ahead of time,

4  did you?

5  A.  No.

6  Q.  And your procedure wasn't written down in any way ahead

7  of time?

8  A.  No.

9  Q.  Prior to reviewing the contents of the one disc that you

10  received that you deemed responsive, did you speak to AUSA

11  Kunz or anyone else regarding the procedure that you intended

12  to follow in executing the search warrant?

13  A.  No.

14  Q.  You just did it on your own?

15  A.  Yes.

16  Q.  And when you -- what is an evidence review computer, you

17  mentioned that?

18  A.  It's a standalone computer that's not connected to the

19  IRS network.  So it's a --

20  Q.  What is the purpose of using it?

21  A.  It's not connected to the internet or our internal

22  computers.  I mean, you're uploading evidence.  We are

23  getting actual emails, so we don't know what are in those

24  emails.  There could be viruses, all kinds of things.  So

25  it's a separate evidence review station.

1  Q.  When you uploaded the disc of emails that you received

2  from Network Solutions, what populated?  You mentioned there

3  were 30,000 emails.  Were they individual emails; was it a

4  .pst load file?

5  A.  They were individual emails.

6  Q.  Were they in a file structure of any kind?

7  A.  I'm not sure.  I don't recall what file structure they

8  were in.

9  Q.  Okay.  How much time past between when you received this

10 disc and when you actually effectuated the search of these

11 emails?

12 A.  Almost immediate.

13 Q.  The same day?

14 A.  Well, there's 30,000 emails, but I started my review

15 probably almost the same day.

16 Q.  How long did that review take you?

17 A.  I don't know.

18 Q.  More than a week?

19 A.  More than a week.

20 Q.  More than a month?

21 A.  I don't know.  Maybe a month.

22 Q.  More than two months?

23 A.  I don't think it was more than two months.

24 Q.  Did you write down how long it took in any way?

25 A.  No.

1    Q.  Did you notify anybody when your search was complete?

2    A.  No.

3    Q.  Aside from -- well, strike that.

4        You mentioned that the first thing you did was go through

5    and look for -- sort out the spam; is that correct?

6    A.  Yes.

7    Q.  What did you determine was spam, Facebook notifications?

8    A.  Facebook notifications, Twitter notifications, all sorts

9    of spam emails from retailers.  Things like that.

10   Q.  And when you sorted them out, where did you put them?

11   A.  I sorted by sender so I could see in the screen where

12   they were.  I didn't move them anywhere.  Then I went by from

13   sender, and I could read, based on the relevant senders,

14   people who I knew were co-conspirators.  Things like that.

15   Q.  Did you delete them from the disc?

16   A.  No.

17   Q.  Did you put them in a separate file?

18   A.  Which?  The ones I reviewed?

19   Q.  The non-pertinent emails.

20   A.  Yes, the non-pertinent emails went into the non-pertinent

21   folder.

22   Q.  And where was that folder contained?

23   A.  I don't understand your question.  On the evidence review

24   computer.

25   Q.  On the evidence review computer?

1  A.  Yes.

2  Q.  Were you just dragging them out off of the evidence disc

3  and putting them in a non-pertinent folder?

4  A.  The evidence disc -- I copied the emails onto the

5  evidence review computer.  The evidence disc stayed the way

6  it was, it was removed.  So the emails that are on the

7  evidence review computer, if I reviewed an email that was

8  pertinent, it would go in the pertinent folder.  If it wasn't

9  pertinent, it would go in the non-pertinent folder.

10  Q.  When you were done with your search, what happened with

11  the non-pertinent folder and the pertinent folder?  Did those

12  stay on the evidence review computer or did you take them

13  with you?

14  A.  They are on the evidence review computer.

15  Q.  Can anybody review them now?

16  A.  No.

17  Q.  The non-pertinent emails?

18  A.  I recently copied them and provided them to the defense.

19  Q.  When I say "non-pertinent emails," what does that term

20  mean to you?

21  A.  Emails that are not relevant to the investigation and not

22  seizable under the search warrant.

23  Q.  Like the Facebook notifications and LinkedIn

24  notifications?

25  A.  No.  Those are obviously not pertinent, but those were

1  not reviewed.

2  Q.  Those were not reviewed?

3  A.  No.  The emails in the non-pertinent folder were emails

4  that were reviewed that on the face of the email appeared to

5  be relevant to the investigation, seizable; but once

6  reviewed, were not so they were separated.

7  Q.  Okay.  The emails which were clearly not relevant, which

8  could not be seized, where were those emails stored?

9  A.  In the main file on the evidence review computer.

10  Q.  Do you still have access to that folder?

11  A.  Yes.

12  Q.  Could you open it now if you wanted to?

13  A.  Yes.

14  Q.  It's not locked?

15  A.  No.

16  Q.  It hadn't been turned over to some separate team?

17  A.  No.

18  Q.  Still in the government's possession?

19  A.  Yes.

20  Q.  During your review of the emails which you deemed to be

21  relevant, in your determination of whether they were

22  pertinent or non-pertinent, did you come across any emails

23  that you believed would require further taint review?

24  A.  No.

25  Q.  You didn't come across any emails involving a James

*Christopher Pekerol - Direct*

1  McCauley?

2  A.  I don't recall that name.

3  Q.  Do you recall Morgan Lewis?

4  A.  I recall that from an interview of Colby Miller.

5  Q.  Do you recall seeing any emails in Ms. Giovanni's

6  computer regarding Morgan Lewis?

7  A.  No.

8  Q.  In your review you didn't keep a written timeline of the

9  steps you took?

10  A.  No.

11  Q.  You didn't memorialize any notes?

12  A.  No.

13  Q.  Did you notify the court at the end of your review and

14  which emails were seized?

15  A.  No.  Once I received the responsive records, that's when

16  I did my email return or the search warrant return.

17  Q.  Since the conclusion of your search, have you ever gone

18  back into the folder containing emails which are clearly

19  nonresponsive?

20  A.  Only to provide it as discovery.

21       MR. GODDEYNE:  One moment.

22  BY MR. GODDEYNE:

23  Q.  The warrant to search the emails for

24  *agiovanni@bidsteam.com*, Attachment B, was broke into two sections:

25  one, information to be disclosed as well as, two, information

1     to be seized; is that correct?

2     A.  Correct.

3     Q.  Nowhere in the warrant is there a protocol, right?

4     A.  That's correct.

5     Q.  So the protocol that you followed is a protocol that you

6     came up with?

7     A.  No.  It's the protocol I was trained how we do it.

8     Q.  That's how you do it in IRS CID?

9     A.  That's the way I was trained as a new agent.  Whether all

10     of IRS CID does that, I don't know.

11     Q.  And trained by whom?

12     A.  The senior agents that I work with.

13     Q.  But there was no judicial authorization of this protocol

14     so far as you knew?

15         THE COURT:  I got that.

16         MR. GODDEYNE:  All right.  Thank you, sir.  No

17     further questions.

18         THE COURT:  Redirect?

19         MR. KUNZ:  None, Your Honor.  Thank you.

20         THE COURT:  Mr. Pekerol, I need to make sure I

21     understand this.  I think I'm with you.  You get the disc, you

22     upload it on the freestanding computer.  So now you've got a

23     copy of the 30,934 emails.  You can eliminate a lot of those

24     right away.  They are Facebook notifications; they may be

25     retailers, solicitations, that kind of junk that we all get

1    all the time.

2          How, though, did you eliminate those?  Did you go

3    through and do it?

4          THE WITNESS:  When you say "eliminate," I think -- I

5    didn't delete these emails.

6          THE COURT:  But you just skipped over them?

7          THE WITNESS:  Yes.

8          THE COURT:  At some point you put eyes on every one

9    of the 30,000 entries.

10          THE WITNESS:  Yeah.  Well, I could sort by sender and

11    say, for instance, the retailer Coach, there may have been a

12    hundred of those.  So I could just skip through those real

13    quick and continue down.

14          THE COURT:  Ah.  All right.  So you sort them by

15    sender, and you can just zip through them.  But you really do

16    look at the 30,000 entries.  There may be 75 entries from one

17    person, so you don't put eyes on each one of the 75, you can

18    see real quickly that 75.  But you actually go through all of

19    the 30,000 of them.

20          THE WITNESS:  I'm not looking at the content of the

21    email.  I'm looking at -- almost, as if you would look at

22    Microsoft Outlook, I can see the sender, the date, and just

23    that information there.  And based on that, I could see what

24    was potentially relevant and what was not.

25          THE COURT:  So you just skip over those.  And I take

1    it from what you said that there were 942 that you didn't just

2    skip.

3              THE WITNESS:  Yes.

4              THE COURT:  And you opened every one of those.

5              THE WITNESS:  Yes.  Well, to be clear, those would be

6    the most I opened, because there was a lot of duplicates.  So

7    Ms. Giovanni would copy herself sometimes five or six times on

8    the same email.  So I may open one or two of those, realize

9    they are all the same, and just put those into the relevant

10   folder, the pert or non-pert folder.

11             THE COURT:  But this is not a case where you chose

12   the ones to look at by using search protocols.  It's not like

13   you took 30,934 and you ran a search for the name, whatever,

14   you got a John Doe involved, you didn't do a search for John

15   Doe; you just went down these.

16             THE WITNESS:  Well, I did both.  I sorted by sender,

17   so I could see first the relevant emails based on the actual

18   sender, say Colby Miller, the victim.  After I did all that,

19   then I started using search terms to make sure I didn't skip

20   over anything that I shouldn't have skipped over as a safety

21   protocol.

22             THE COURT:  So you did apply search terms to the

23   30,934 emails.  So if "Colby Miller" had shown up in an email

24   from somebody that appeared to be not a likely sender, you

25   would have found it.

1          THE WITNESS:  Yes.  That's what resulted in a lot of

2     those 200, is I would type in, say, "Kurdistan," well, that

3     would result -- that may have resulted in some that were

4     reviewed but ended up being non-pertinent.

5          THE COURT:  Got it.  Okay.

6          All right.  Questions just to follow up on mine?

7          MR. KUNZ:  Not by the government.

8          MR. GODDEYNE:  Yes, Your Honor, briefly.

9                      RECROSS-EXAMINATION

10    BY MR. GODDEYNE:

11    Q.  What search terms did you use?

12    A.  I don't recall all of them.  I didn't write them down.

13    Q.  You didn't write them down?

14    A.  No.

15    Q.  So is it fair to say that, after you sorted emails in the

16    pert and non-pert folder to make sure you didn't miss

17    anything, you went through and came up with search terms off

18    the top of your head?

19    A.  They were not off the top of my head.  They were -- most

20    of them were in the ICC, the names of the victims, names of

21    the co-conspirators, Kurdistan, Barzoni.  Things like that.

22    Q.  Anything beyond what was included in the items to be

23    seized?

24    A.  Not that I recall.

25          MR. GODDEYNE:  No further questions, Your Honor.

1          THE COURT:  Thank you, Mr. Pekerol.  You may step

2   down and return to counsel table.

3                  *  *  *  *  *  *  *  *  *

4          THE COURT:  Rebuttal evidence for the government?

5          MR. KUNZ:  Yes.  I call Agent Pekerol to the stand,

6   sir.

7          THE COURT:  This is really rebut evidence, okay.

8          MR. KUNZ:  Yes, sir.

9       (**CHRISTOPHER PEKEROL**, having been previously duly sworn,

10   was recalled by the government.)

11          THE COURT:  Mr. Pekerol, you may be seated.  You are

12   still under oath.

13          Mr. Kunz, you may proceed.

14          MR. KUNZ:  Thank you, Your Honor.

15                          DIRECT EXAMINATION

16   BY MR. KUNZ:

17   Q.  Agent Pekerol, were you present with Special Agent

18   Borghini on January 11, 2017, during the execution of the

19   search warrant?

20   A.  Yes, I was.

21   Q.  And more specifically were you with him when he and you

22   spoke with and interviewed Ms. Giovanni?

23   A.  Yes.

24   Q.  And in terms of when you first met with her, did she --

25   where were you when you first met with her?

1   A.   It was in the -- I guess it's like a formal sitting area.

2   Q.   Okay.  And that was the area -- was that that Room E

3   where there's the chair and everything else?

4   A.   Yes.

5   Q.   Now, were you present when there is any discussion with

6   respect to Agent Borghini indicating to Ms. Giovanni that she

7   did not have to answer any questions and she was free to go?

8   A.   Yes.

9   Q.   Okay.  He said that?

10  A.   Yes, one of the first things that he told her.

11  Q.   Did he also tell her that she was not under arrest and

12  was not obligated to say --

13          THE COURT:  Let me just tell you, I'm the one that

14  wants to move things along, but when you ask leading questions

15  and your witness says, yes, you persuade me almost none.  So

16  if you want to persuade me, you might want to ask him what

17  Mr. Borghini said, not tell him what Mr. Borghini said.

18  BY MR. KUNZ:

19  Q.   What did Agent Borghini say to Ms. Giovanni?

20  A.   Sure.  He explained to her that we were there to execute

21  the search warrant, she wasn't under arrest, she was free to

22  leave, but we would like to ask her a few questions.  And she

23  willingly agreed to speak with us.

24  Q.   Now, did you participate in asking any of the questions?

25  A.   Yes.

*Christopher Pekerol - Direct*

1    Q.   And did you raise your voice in the interview with her?

2    A.   No.

3    Q.   How about Mr. Borghini?

4    A.   No, he didn't.

5    Q.   At any time did you provide her an opportunity to have a

6    smoke?

7    A.   Lots of opportunity.  She smoked a lot of cigarettes

8    while we were there.

9    Q.   Explain to the court what did you do in allowing her to

10   do that.

11   A.   Well, she smoked probably a pack of cigarettes while we

12   were there.  I opened the window near the sitting area so she

13   could smoke a cigarette.  She was drinking coffee.  She

14   smoked so many cigarettes that it was getting smoky in there,

15   and that's when we told her that, if she wanted to continue

16   smoking cigarettes, she would have to go outside.  So each

17   time she wanted to smoke a cigarette, an agent would walk

18   with her outside.  So she would go out front and smoke a

19   cigarette.

20   Q.   Now, was she ever taken upstairs to get some different

21   clothes on or anything else?

22   A.   I don't recall that.  I certainly didn't go up there with

23   her.

24   Q.   Now, after -- let me just move ahead for a minute.

25        After the search warrant was done, Agent Borghini

*Christopher Pekerol - Direct*

1   prepared a report of the interview of Ms. Giovanni; is that

2   correct?

3   A.  Yes.

4   Q.  Did you have any role or did you have any participation

5   in the preparation of that 302?

6   A.  Yes, I helped him write it.

7   Q.  And, obviously, without going into a lot of details,

8   there was a lot of questions and answers asked of

9   Ms. Giovanni; is that correct?

10  A.  Yes.

11  Q.  Okay.  Is that more than what she just indicated to the

12  court, that you didn't ask anything about Colby Miller or any

13  other individuals in the case?

14  A.  What she said is not accurate.

15  Q.  Here, you mean?

16  A.  Yes.

17  Q.  Is that what you're talking about?

18  A.  Yes, in here just a minute ago.

19  Q.  So you did interview her about a lot of things relevant

20  to the case; is that correct?

21  A.  Yes, we did.

22  Q.  And from her demeanor with you, did she voluntarily talk

23  to you that day?

24  A.  Yes.  She eagerly wanted to speak to us.  She said she

25  could explain everything.

1          MR. KUNZ:  That's all I have.

2          THE COURT:  Cross-examine?

3                    CROSS-EXAMINATION

4    BY MS. SILVER:

5    Q.  Agent Pekerol, did you participate in any of the

6    interviews of the Shallal brothers?

7    A.  I did not.

8    Q.  Okay.  Were you and Borghini together during the entire

9    time of the execution of the search warrant?

10   A.  For the most part.  He would occasionally have to leave

11   to answer questions of the agents.  Sometimes I would have to

12   hang back with Ms. Giovanni.

13   Q.  Okay.  Were you with Ms. Giovanni during the entire time

14   of the search warrant?

15   A.  There were times such as when she had to go to the

16   bathroom that a female agent would go with her.  A different

17   agent may have taken her out to smoke a cigarette at some

18   point.  But I was primarily with her the whole time.

19   Q.  Did you observe when she came into the residence?

20   A.  I don't recall it.

21   Q.  Okay.  So could there be a several-minute gap that you

22   weren't with Ms. Giovanni when she first entered the

23   residence?

24   A.  Yes.

25   Q.  Okay.  Maybe 10, 15 minutes?

1  A.  Not 10 or 15 minutes, but maybe a couple of minutes.

2  Q.  Okay.  Otherwise would you say that you maintained eye

3  contact and was with Ms. Giovanni during the entire time of

4  the search warrant with the exception you're saying when she

5  went to the bathroom?

6  A.  Yes.

7  Q.  Because a female agent then was with her, right?

8  A.  There may have been incidences when maybe I had to go get

9  something out of the car, but for the most part I was around

10 Ms. Giovanni, yes.

11 Q.  Okay.  So then when -- at some point do you agree that

12 Agent Borghini had had some conversation, communication with

13 Ms. Giovanni outside of your presence?

14 A.  If he did, I wasn't there so I wouldn't know.

15 Q.  Okay.  So you would say that that's reasonable that that

16 could have happened?

17 A.  It could have.

18 Q.  Right?

19 A.  Sure.

20 Q.  And that's reasonable?

21 A.  Is it reasonable?

22 Q.  Right.

23 A.  I wasn't there, so I don't know.

24 Q.  Okay.  But what I'm getting at is you know that Agent

25 Borghini was doing other things and was outside of your

1  knowledge, that is reasonable, he could have been having

2  certain discussions with Ms. Giovanni, and you weren't there

3  for them?

4  A.  Sure.

5  Q.  Okay.  Now, you're saying that there was an interview

6  that was conducted, right?

7  A.  Yes.

8  Q.  That Agent Borghini did conduct an interrogation with

9  Ms. Giovanni?

10  A.  It wasn't an interrogation.  It was a consensual

11  interview.

12  Q.  Well, interrogation, interview, same thing.  He's asking

13  questions, she's giving answers.

14        MR. KUNZ:  I object.

15        THE COURT:  Let's move on.

16        MS. SILVER:  Okay.

17  BY MS. SILVER:

18  Q.  At the beginning of that is when you say Agent Borghini

19  said, "Look, you're free to go; you don't have to answer any

20  questions"?

21  A.  Yes.

22  Q.  Is that right?

23  A.  (Nods head.)

24  Q.  And you heard that one time at the beginning of the

25  interview?

1    A.   Yes.

2              MS. SILVER:  Nothing further.

3              THE COURT:  Redirect?

4              MR. KUNZ:  Just one point.

5                        REDIRECT EXAMINATION

6    BY MR. KUNZ:

7    Q.   Did Ms. Giovanni show you any card about a lawyer?

8    A.   No.

9              MR. KUNZ:  Nothing further, sir.

10             THE COURT:  Thank you.  Mr. Pekerol, you may step

11   down and return to counsel table.

12        (End of excerpt.)

13

14                   *   *   *   *   *   *   *   *

15

16   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.  Any
17   redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
18   transcript.

19

20

21   *Judy A. Gagnon*                          *9/7/2018*
     Judy A. Gagnon, RMR, FCRR                 Date
22   Official U.S. Court Reporter

23

24

25

INDEX


WITNESS FOR THE GOVERNMENT:                                    PAGE


  **_CHRISTOPHER PEKEROL_**
        DIRECT EXAMINATION BY MR. KUNZ................... 3
        CROSS-EXAMINATION BY MR. GODDEYNE............... 8
        RECROSS-EXAMINATION BY MR. GODDEYNE.............. 20


                    *   *   *   *   *   *   *   *


WITNESS FOR THE GOVERNMENT ON REBUTTAL:                        PAGE


  **_CHRISTOPHER PEKEROL_**
        DIRECT EXAMINATION BY MR. KUNZ................... 21
        CROSS-EXAMINATION bY MS. SILVER................. 25
        REDIRECT EXAMINATION BY MR. KUNZ................ 28

                    *   *   *   *   *   *   *   *